## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| M. KATHLEEN McKINNEY, Regional Director of Region 15 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, | ) ) ) ) ) ) | |
| Petitioner, | ) | No. 2:22-cv-2292-SHL-cgc |
| v. | ) ) | |
| STARBUCKS CORPORATION, | ) ) | |
| Respondent. | ) | |

## ORDER GRANTING IN PART PETITION FOR TEMPORARY INJUNCTION

This matter arises (primarily) from the termination of seven partners[1] employed at Respondent Starbucks Corporation's ("Starbucks") store located at 3388 Poplar Avenue in Memphis, Tennessee ("Memphis Store").  M. Kathleen McKinney, on behalf of the National Labor Relations Board ("Petitioner" or "Board"), asserts that Starbucks fired these partners, coined by some as the "Memphis Seven," for participating in activity protected under § 7 of the National Labor Relations Act ("NLRA" or "Act"), and took other actions to interfere with pro-union activity at the Memphis Store, all in violation of §§ 8(a)(1) and (3) of the Act.  In response, Starbucks contends that all of the actions that it took in relation to these partners – including their terminations – were consistent with the enforcement of its internal policies and its previous corporate practices.

---

[1] Starbucks identifies its employees as "partners."  (ECF Nos. 73 & 75.)

Thus, before the Court is the Board's Petition for Temporary Injunction Pursuant to § 10(j) of the National Labor Relations Act, (ECF No. 1 ("Petition")), and its attachments.  (ECF Nos. 1-2 (Index of Exhibits) & 1-3 (Memorandum in Support of Petition).)  As part of the Court's hearing on the Petition on June 9-10, 2022, other documents filed by the Parties include Starbucks' Pre-Hearing Memorandum of Points and Authorities in Opposition to Petitioner's Petition for Temporary Injunction, (ECF No. 61), Starbucks' Post-Hearing Memorandum, (ECF No. 81), Petitioner's Post-Hearing Brief, (ECF No. 82), Petitioner's Reply Brief to Starbucks' Post-Hearing Brief, (ECF No. 84), and Starbucks' Reply in Opposition to § 10(j) Relief (ECF No. 85.)  As explained below, the Court **GRANTS IN PART** Petitioner's request for temporary injunctive relief.

**PROCEDURAL BACKGROUND**

This matter commenced before the Board when, on February 8, February 9, and April 12, 2022,[2] Workers United ("the Union") filed multiple charges of unfair labor practices against Starbucks.  The charges were referred to Petitioner as Regional Director of Region 15 of the Board.  (ECF No. 1 at PageID 2.)  Following an investigation, the Board's General Counsel issued a Consolidated Complaint and Notice of Hearing on April 22, 2022.  (Id. at PageID 3.)  Ultimately, the Board issued an Order Further Consolidating Cases, Second Consolidated Complaint and Notice of Hearing ("Consolidated Complaint") on May 9, 2022, alleging that Starbucks engaged in unfair labor practices in violation of §§ 8(a)(1) and (3) of the NLRA.  (Id.)

Based on these allegations, the Board filed this Petition on May 10, 2022, seeking a cease and desist order, as well as various forms of affirmative relief including, but not limited to,

---

[2] The April 12, 2022 charge was amended and filed with the Board on May 9, 2022.  (ECF No. 1.)

interim reinstatement of the Memphis Seven to their former positions of employment.  (ECF No. 1.)  Three days later, the Court held a Status Conference with the Parties and set a hearing on the Petition for June 9-10, 2022, providing the Parties time to conduct expedited discovery and file supplemental briefs.  (ECF No. 28.)  The Court permitted Petitioner to supplement the record with the affidavits of Richard Bensinger, Cara Nicole Taylor, and an unnamed Starbucks employee.  (ECF No. 51-2, 51-3, 51-4.)  The Court also permitted the Union to participate as amicus curiae.[3]  (ECF No. 45.)  On June 3, 2022, Starbucks filed a Pre-Hearing Memorandum. (ECF No. 61.)

The hearing began on June 9, 2022.  (ECF No. 70.)  That day, the Court heard the testimony of Petitioner's witnesses Cara Nicole "Nikki" Taylor (and the introduction of Exhibits 1-12); former Store Manager Amy Holden; Reaghan Hall (Exhibits 13-14); Luis "Beto" Sanchez; Anna "Ax" Heiberg (Exhibit 16); and Margaret "Maggie" Carter.  (Id.)  The following day, the Court started with the testimony of the Board's witness Richard Bensinger via Teams (Exhibit 22).  After denying Respondent's Oral Motion for Judgment on Partial Findings, the Court heard the testimony of Regional Director Amandalynn Line (Exhibits 24-37); District Manager Cedric Morton (Exhibits 38-48); Partner Resources Consultant Kimberly Harris (Exhibits 49-53); and Senior Manager of Partner Relations Steve Fox (Exhibits 54-55).[4]  (See Exhibit and Witness List, ECF No. 72.)  The Court granted Starbucks' post-hearing Motion to

---

[3] The Union filed two documents in its capacity as amicus: a Brief in Support of the Regional Director's Petition, (ECF No. 80), filed June 24, 2022, and a Brief in Response to Starbucks' Post Hearing Brief, (ECF No. 83), filed July 1, 2022.
[4] Also admitted into evidence were Plaintiff's Exhibits 15 and 23, and Respondent's exhibits 10, and 17-21.  (See ECF Nos. 70 & 71.)

supplement the record with one exhibit, (ECF No. 76-2), and the Parties filed post-hearing briefs, (ECF Nos. 81 & 82), and responses to opposing briefs.  (ECF Nos. 84 & 85.)

## FACTUAL BACKGROUND

The following facts come from the Petition and Petitioner's submitted affidavits, (ECF Nos. 1-2 & 1-3), as well as hearing testimony and exhibits.[5]  (ECF Nos. 73, 75, 79.)  Because the Court is not permitted to resolve conflicting evidence when reviewing a § 10(j) petition for injunctive relief, it simply notes the conflicts within the evidence presented.  See Muffley ex rel. NLRB v. Voith Indus. Servs., Inc., 551 F. App'x 825, 827 (6th Cir. 2014).

### I. The Memphis Store

Starbucks is the largest coffeehouse chain in the world, with approximately 9,000 stores across the nation.  One of them – the "Memphis Store" – is located at Poplar Avenue and Prescott Street, near the intersection of Poplar and Highland Avenue in Memphis, Tennessee.

For purposes of this Order, the Memphis Store's story begins in November 2021, when Amy Holden was serving as its store manager.  (ECF No. 73 at PageID 1433.)  One Starbucks partner, Nikki Taylor, had transferred to the role of shift supervisor at the Memphis Store during Holden's tenure, having previously worked for her at a different location.  (ECF No. 73 at PageID 1359-60.)

---

[5] Starbucks objects to all of the hearsay statements introduced by the Board in support of the Petition.  However, courts reviewing petitions for injunctive relief disfavor strict adherence to the rules of evidence.  See, e.g., Fidelity Brokerage Servs. LLC v. Clemens, No. 2:13-CV-239, 2013 WL 5936671, at *5 (E.D. Tenn. Nov. 4, 2013); see also Damon's Rests., Inc. v. Eileen K Inc., 461 F. Supp. 2d 607, 620 (S.D. Ohio 2006) (recognizing that "district Courts within [the Sixth Circuit] have considered such [hearsay] evidence, as have numerous other circuit courts," in determining preliminary injunctive relief) (citations omitted)).  The Court therefore considers the evidence presented, "admissible or not, but assign[s] it only the weight it deserves."  J.P. Morgan Sec. LLC v. Logsdon, No. 3:22-CV-14-BJB, 2022 WL 179606, at *2 (W.D. Ky. Jan. 18, 2022) (internal citations omitted).

According to Holden, the training provided to the partners she supervised at the Memphis Store included receipt of the Partner Guide. (Exhibits 10, 12.) She testified that the Partner Guide was handed out on the first day of a partner's shift, but "[t]here was no way in those two hours [of on-boarding] that they would be able to read that guide, but they were told to sign the guide as an acknowledgment of receiving [it]." (ECF No. 73 at PageID 1440.) She also explained the "knowledge gap" versus "skill gap" consideration made before issuing discipline – testifying that Starbucks wanted to ensure that a partner was "aware of what the policy is before we would proceed with any corrective action." (Id. at PageID 1442-43.)

Holden also testified that, upon her arrival at the Memphis Store, she was asked to tackle the partners' noncompliance with the dress code. (Id. at PageID 1434.) She stated that Taylor "assist[ed]" her with the task, and, as a result of their efforts, Holden did not have to send anyone home or deliver any corrective actions for dress code violations while she was Store Manager – although, if she had issues, she would send the partner home to change before delivering corrective action. (Id. at PageID 1435.)

On November 20, 2021, Holden promoted partners Kylie Throckmorton and Lakota McGlawn to shift supervisors. (Id. at PageID 1442.) The next day, she took a leave of absence from Starbucks. (Id. at PageID 1433.) Holden testified that she told District Manager Morton that neither Throckmorton nor McGlawn had received computer training as part of their promotion. (Id. at PageID 1442.)

When Holden took her leave of absence, Elizabeth Page became the "proxy manager" for the Memphis Store – holding the role of Store Manager until a new manager was transferred or hired. (Id. at PageID 1360-61.) Mia Poindexter was the assistant manager under Page. (Id. at PageID 1361.)

## II.     Early Organizing Efforts

Nikki Taylor was the first partner to spark the organizing effort at the Memphis Store. When she learned about union organizing taking place at a Starbucks location in Buffalo, New York, in December 2021, she and others "realized [they] had some of the same issues that [the Buffalo partners] were having."  (Id. at PageID 1362, 1458.)  Around January 1, 2022, Taylor called and later emailed the Buffalo partners, who told her to connect with the Union.  (Id. at PageID 1363, 1365.)

Taylor testified that she told fellow partners Beto Sanchez and Throckmorton about her engagement with the Buffalo store.  She also stated that, in the first two weeks of January 2022, she spoke to Sanchez, Nabretta Hardin, Throckmorton, Reaghan Hall, Makayla Abrams, and "Savannah" about her contact with the Union.  (Id. at PageID 1367.)  Sometimes they would talk behind the bar area, sometimes in the café, sometimes in the "back of house."  (Id. at PageID 1367.)  Taylor testified that partners worked in close proximity, (id. at PageID 1366), and that she spoke about organizing with partners in the Memphis Store several times when managers – including Page, Poindexter and Morton – were present.  (Id. at PageID 1363-64, 1367.)

There were two conversations during which Taylor remembered specific managerial interaction.  In one, Taylor was telling Hardin and Throckmorton about meeting with the Union and the next organizing steps while Assistant Manager Poindexter was close enough to hear the conversation; according to Taylor, Poindexter stopped the conversation "to ask about details about what the meeting was about and things of that nature."  (ECF No. 73 at PageID 1368.)  Taylor testified that she had stated aloud to the others that it was a union meeting, but did not say so directly to Poindexter.  (Id. at PageID 1417-18.)  However, Taylor "guess[es] that [Poindexter] heard," given how close she was to the partners at the time.  (Id. at PageID 1418.)

Taylor also testified that, another time, she, Hardin and Hall were discussing work conditions when Store Manager Page was "in the area to hear the conversation." (Id. at PageID 1364.) After Page asked what they were discussing, Taylor responded with "nothing in particular." (Id. at PageID 1365.) Page told them to stop and "get back to work." (Id.)

## III.   Issuance of Discipline to Nikki Taylor

Starbucks' first allegedly unlawful behavior was directed toward Taylor. According to her, within days[6] of her conversations with other partners regarding organizing efforts, Cedric Morton issued two corrective action forms to Taylor without previous discussion or first issuing a warning about the alleged conduct. (ECF No. 73 at PageID 1369-71, 1381; see Exhibits 1 & 2, Jan. 14th Corrective Action Forms.) Morton stated that the first corrective action was for exhibiting "aggressive and insubordinate behavior" toward Store Manager Page and for "complaining about Starbucks" to another partner. (ECF No. 75 at PageID 1161.) Taylor disagreed with the allegations in their entirety. (ECF No. 73 at PageID 1373.) In her affidavit, she contends that Morton told her that she was "too comfortable" at the Memphis Store and recommended that she transfer to another store. (ECF No. 1-2 at PageID 167.)

As for the second corrective action, Taylor stated that Morton told her that she was wearing leggings to work, but she denied doing so. (ECF No. 73 at PageID 1372.) She also testified that Morton told her that he spoke to Store Manager Page before issuing disciplinary action to her. (Id. at PageID 1418.) However, according to Taylor, Store Manager Page explained a different process to Taylor when faced with a later dress code violation by another partner – "that in practice, we would have a conversation with a partner before we had any

---

[6] The Exhibits related to the corrective actions are dated January 14, 2022, which Taylor confirmed in her testimony at the hearing. (See Exhibits 1 & 2; see ECF No. 73 at PageID 1418.)

disciplinary on them." (Id. at PageID 1380-81.)  Neither Morton nor Page had a conversation with Taylor before issuing her discipline and she testified that she witnessed multiple instances of dress code violations that were tolerated.  (ECF No. 1-2 at PageID 168.)

Taylor signed one of the corrective actions and handed both back to District Manager Morton. (ECF No. 73 at PageID 1373.)  According to Morton, he did not deliver the second corrective action (clothing violation) to her, which is why it was unsigned.  (ECF No. 75 at PageID 1164.)  According to him, the unsigned corrective action did not go on her record.  (Id.)

## IV.   Events leading up to January 18

Taylor continued her efforts involving the Union as the disciplinary actions were occurring.  She arranged for the union organizing committee (consisting of her, Throckmorton, Hardin, Hall, McGlawn and Sanchez, see Exhibit 3) to participate in a Zoom meeting with the Union on January 17, 2022.  (ECF No. 73 at PageID 1373-74; ECF No. 1-3 at PageID 250.)  Margaret Carter, a Union representative and Starbucks partner at a different location, and Richard Bensinger, the Union's senior advisor to the Starbucks campaign, participated in the call.  (ECF No. 73 at PageID 1398; ECF No. 75 at PageID 940, 943.)

During the call, the partners drafted a letter to Starbucks' then-CEO, Kevin Johnson, and later that night publicly posted the following letter:

> Statement of Starbucks Workers United Organizing Committee at Poplar and Highland Store
> On this day in Memphis, Dr. Martin Luther King, Jr. Day, in the city where he was killed while fighting for the right of sanitation workers to organize, we as Starbucks partners are launching our union campaign to build a better store and community.
> We are here to fight for our safety and our rights as workers that have been denied and shoved away from us. This day we issue a call to action to our community to assist us in this movement and help us grab what is ours so we can achieve the dignity that we as workers deserve.

With this unionization process we will be able to bring you, the community, a better experience from the company who promises it to you, both for you and for the baristas behind the bars. We say to Starbucks, use this day as a moment of reflection against your apathy towards your workers across the United States.

We as partners are fully aware of the tactics you have been taking to prevent unionization, and we ask you to take Dr King's vision and help us fulfill it. You should live up to your own mission and values and allow us to take these steps without opposition. Please, in the memory of Dr. Martin Luther King, Jr.[,] do not bring your so-called "pro-partner" anti-union campaign to Memphis.

> Kylie Throckmorton
> Nabretta Hardin
> Reaghan Hall
> LaKota McGlawn
> Nikki Taylor
> Beto Sanchez

(Exhibit 3, "Dear Kevin Letter"; ECF No. 75 at PageID 943.)

## V.     Media Event on January 18, 2022

The day after the letter was posted, January 18, 2022, Hardin printed the union authorization cards she received from the Union and openly passed them out to partners at work. (ECF No. 1-2 at PageID 96-97.)  According to Regional Director Line, District Manager Morton and Store Manager Page decided to close the store at 6 p.m. that night due to "short staffing." (ECF No. 75 at PageID 1080.)  However, the staffing schedule showed a full staff – Florentino Escobar, Aiden Harris, Kimora Harris and Lakota McGlawn, as shift supervisor, were scheduled to work that night – and all of those partners were present when the media event occurred.  (Id.; see Exhibit 29.)  Off-duty partners involved that evening were Taylor, Sanchez, Hardin, Throckmorton, and Emma Worrell.  Reaghan Hall was the only member of the organizing committee not present on January 18, 2022.

Taylor testified that, at approximately 6 p.m., she – while off-duty – allowed customers to leave the store, and opened the door for a TV reporter to enter thereafter, without permission to

do so.  (ECF No. 73 at PageID 1413.)  She stated that she was expecting the news crew to arrive, and they had identification and badges.  (Id. at PageID 1423-24.)  According to her, at no point did any partner express safety concerns from the media crew's presence in the store.  (Id. at PageID 1424.)  Regional Director Line stated that Taylor unlocked the door when allowing the reporter in, although Taylor could not recall that detail.  (ECF No. 75 at PageID 1046.)

After the reporter and cameraman entered, off-duty barista Worrell arrived to pick up barista Aiden Harris, who had ended his shift.  (ECF No. 1-2 at PageID 131.)  After being let in by Hardin, (ECF No. 75 at PageID 1050), Worrell signed an authorization card, handed it to Hardin, shared a drink with Harris that they made together, and left without being interviewed by the media crew.  (ECF No. 1-2 at PageID 205-06.) While this took place, Regional Director Line testified that barista Kimora Harris appropriately performed her closing duties.  (ECF No. 75 at PageID 1044.)

After Worrell and Harris left, the media interviewed partners Escobar, Hardin, McGlawn, Sanchez, Taylor and Throckmorton; each discussed the organizing objectives, the reasons for unionizing and their chances of success.  (ECF No. 1-2 at PageID 145.)  The news crew left by 6:45 p.m.  Several participating partners (Hardin, Sanchez, Taylor and Throckmorton) went behind the counter before departing.  In particular, Sanchez testified that, despite not being the designated cash controller ("the only person to access that safe" during a shift), he entered behind the back of the counter and activated the safe's time delay because McGlawn, shift supervisor that night, did not have a code to the safe.  (ECF No. 73 at PageID 1523-24.)  Regional Director Line testified that Sanchez assisted McGlawn "so that she could participate in the interviews."  (ECF No. 75 at PageID 1044.)

According to the partners, the actions they took that night were routine: they testified that they regularly went behind the counter to gather belongings or make a free drink (an employee perk), came to the store while off-duty to check their work schedule or to retrieve personal items, and accessed or set the safe to assist other partners while off-duty because not all partners had been given a code to access the safe.  (ECF No. 1-2 at PageID 113, 114, 146-47, 206.)

## VI.    Starbucks' Alleged Actions to Restrict Organizing Activity

Store management found out about the media event the next day, after seeing a tweet posted by a news reporter.  (Id. at PageID 216, Twitter Post ("You're looking at the first @Starbucks employees in #Memphis trying to unionize. Hear their grievances, see the steps needed to form a union and find out who's helping these workers tonight on @WMCActionNews5 at 10.").)  When District Manager Morton saw the Twitter post, he notified Regional Director Line.  (ECF No. 75 at PageID 1138.)  Morton testified that Starbucks promptly began an investigation.  (Id. at PageID 1139.)  According to some partners, Starbucks also engaged in activity that restricted the partners' ability to openly organize, starting with interference with a planned sit-in.

### A.  Interference with Sit-In Campaign: January 21-23, 2022

The day after the media event, on January 19, 2022, the Union and the employee organizing committee scheduled a sit-in campaign for January 21-23, 2022.  (ECF No. 73 at PageID 1382-83, 1459.)  Taylor helped to post flyers advertising the sit-in on Twitter, and Hall advertised it on Instagram.  (ECF No. 73 at PageID 1383, 1419, 1460; see Exhibit 5.)  That same day, District Manager Morton made the decision to restrict the Memphis Store to drive-thru only and limited the hours of operation during the planned sit-in campaign (January 20-23, 2022), due to alleged "spotty sort of coverage or attendance."  (ECF No. 75 at PageID 1158.)  Morton

testified that he learned about the sit-in on January 20 or 21, 2022, after deciding to close the lobby café.  (Id. at PageID 1160.)

On the first day of the sit-in, January 21, the lobby café was closed.  As for Saturday, January 22, Hall testified that Store Manager Page called her on the 21st to notify her that the next day, the Memphis Store would be "with drive-thru only as a precaution to us being short-staffed."  (ECF No. 73 at PageID 1462 (emphasis added).)  However, when the Memphis Store had normal staffing levels on January 22, 2022, Hall and Sanchez decided around mid-day to open the lobby.  (Id. at PageID 1463.)  Morton came to the store shortly after and asked why the lobby café was open because (according to Hall) he "was under the assumption that it was supposed to stay closed no matter what."  (Id. at PageID 1465.)  Hall testified that Morton told her that she and the other Memphis partners probably believed that the café was closed due to "certain dates," but he also stated that "he supported [their] decision to fight for [their] rights." (Id. at PageID 1466.)  Hall also worked on January 23, 2022, opening the store with the same number of people they had the day before.  (ECF No. 73 at PageID 1467.)  Despite being fully staffed, the lobby remained closed during her whole shift.  (Id.)

According to Hall, the rationale for closing the lobby because of lack of staff only applied to the days of the scheduled sit-in, even though the store was fully staffed during at least part of that time.  The policy did not apply after the sit-in ended, when the store was actually understaffed.  For instance, on January 24, 2022, when Hall reported for her opening shift, the store was understaffed at its peak time.  She asked Store Manager Page if the store was supposed to be drive-thru only due to understaffing, but Page told her that normal operations were back. (ECF No. 73 at PageID 1469.)

### B.  Removal of Flyers from Community Bulletin Board

The next anti-organizing action that Starbucks management allegedly took was removal of the partners' pro-union flyers from the community bulletin board, despite routine noncompliance with a policy of "refreshing" the board.

As background, Taylor testified that partners and members of the public were allowed to post items or information on this bulletin board and that she was not aware of any <u>enforced</u> Starbucks policy requiring the removal of items from the board.  (ECF No. 73 at PageID 1388.) In line with Hall's characterization of the practice to "periodically clean up the bulletin board," (<u>Id</u>. at PageID 1500), Taylor stated that she would remove outdated items, but "if it wasn't outdated, [items were] still on the board."  (<u>Id</u>. at PageID 1420.)  In contrast, Regional Director Line testified that the company policy, and her expectation, was that content would be "refreshed at least on a weekly basis."  (ECF No. 75 at PageID 1070; <u>see</u> Exhibit 25.)

Having received pro-union materials from customers during the sit-in campaign, Hall testified that she subsequently posted these materials on the community bulletin board.  (ECF No. 73 at PageID 1470-71; <u>see</u> Exhibit 7, Board with Support Letters.)  Those materials were still on the board the day that Taylor returned to work after the sit-in, but were removed shortly thereafter.  (<u>Id</u>. at PageID 1388-89; <u>see</u> Exhibits 7 & 8.)  However, Hall testified that they only stayed up "about a week and a half"[7] before Page removed them.  (<u>Id</u>. at PageID 1472; <u>see</u> <u>also</u> ECF No. 1-2 at PageID 72 ("Page proceeded to begin only taking the pro-union campaign messages off the bulletin board.").)  And Sanchez testified that District Manager Morton told him that putting these pro-union notes on the bulletin board violated company policy.  (ECF No.

---

[7] In contrast, Taylor testified that, by "Thursday or Friday that week, [the bulletin board] was completely empty."  (ECF No. 73 at PageID 1390.)

1-2 at PageID 148.)  According to partners, Starbucks removed all of the other remaining material from the board and repositioned the condiment bar to make the board less noticeable, stating that the move was "part of remodeling the store."  (ECF No. 1-2 at PageID 70.)

### C.  Termination of the "Memphis Seven"

On February 8, 2022, Starbucks terminated five of the six organizing committee members – partners Hardin, McGlawn, Sanchez, Taylor and Throckmorton – and other partners engaging in union activity, Escobar and Worrell, allegedly for committing terminable policy violations during the January 18 media event.  District Manager Morton, who made the decision to terminate the Memphis Seven, stated that he did so for the following reasons:

1. Worrell, while off-duty, entered the store and the back of house area after closing.
2. Hardin, while off-duty, was in the store after closing, and unlocked a locked door to allow an unauthorized person to enter.
3. Escobar stayed in the store after closing and went behind the counter and in the back of house area after his shift ended.
4. Throckmorton, while off-duty, was in the store after closing and went into unauthorized areas.
5. Taylor, while off-duty, was in the store after closing, went into the back of house area, and unlocked a locked door after closing to allow unauthorized individuals to enter the store.
6. Sanchez, while off-duty, was in the store after closing, went into the back of house area, and activated the safe and handled cash.
7. McGlawn, as shift supervisor, "allowed all of these things to happen," including allowing off-duty partners to remain in the store after closing and allowing safety-related policy violations, putting partners at risk.

(ECF No. 75 at PageID 1142-52; see Exhibits 9, 39-44.)  Overall, these offenses can be categorized as doing the following after the store was closed: (1) being in the store while off-duty; (2) entering the back of house or behind the counter while off-duty; (3) unlocking a locked

door to allow an unauthorized person to enter while off-duty; (4) activating the safe and handling cash while off-duty; and (5) supervising the previous actions.

As for the other partners present that night, District Manager Morton testified that barista Aiden Harris was not fired because his policy violation – having a beverage that was not rung up – was not terminable, (ECF No. 75 at PageID 1141; see Exhibit 38), and Regional Director Line confirmed that barista Kimora Harris was not fired because she performed her closing duties appropriately.  (ECF No. 75 at PageID 1044.)

**VII.  Policies versus Practice**

Notwithstanding Starbucks' justifications for these terminations, the Board offered testimony that the relevant policies supporting the terminations were not practically or consistently enforced.  Indeed, Taylor testified that she understood the policies prohibiting (1) off-duty partners from being behind counter or in the back room, (2) nonpartners from being "behind the counter or in the back room/office at any time unless authorized by the store manager. . . and accompanied . . . by a designated store partner on-duty," and (3) customers from accessing the store when closed to be policies "in writing but not in practice."  (ECF No. 73 at PageID 1410-11.)  These practices are discussed in more detail below.

**A.  Off-Duty Partner Being in Store After Closing**

Taylor stated that she had been in the store after the close of business hours while off-duty before the start of the organizing campaign, but was not disciplined for doing so.  (ECF No. 73 at PageID 1394-95.)  She stated that partners would regularly remain in the store after the close of business.  (Id. at PageID 1421.)  For instance, if there was a newer partner who was unaware of the closing duties, "we would come back off-duty to help them close."  (Id. at PageID 1421-22.)  She also stated that the Memphis store operated as a "rendezvous spot,"

meaning that partners would come back, off-duty, to the store and sit in the café before going out to dinner later in the evening.  (Id. at PageID 1422.)  Other times, for those partners without cars, partners with cars would wait for them in the lobby after the close of business.  (Id.)

### B.  Off-Duty Partner Entering Back of House/ Behind Counter

Hall also confirmed the policy of prohibiting off-duty partners access to the store when the store was closed, but stated that she was unaware of any other partner who was discharged for going to the back of the house or behind the counter while being off-duty, or for being in the store after closing.  (ECF No. 73 at PageID 1503, 1516.)  Confirming that lack of policy enforcement, Taylor testified that, before starting the organizing campaign, she had gone behind the counter or to the back room or office area while off-duty, but was not disciplined for doing so.  (ECF No. 73 at PageID 1395.)

### C.  Off-Duty Partner Unlocking Door to Allow Unauthorized Person to Enter

Hall testified that the Starbucks policy prohibits partners from letting anyone into the store after the door is locked at closing time.  (ECF No. 73 at PageID 1508.)  Despite that policy, Taylor stated that she was not disciplined for opening a locked door after the close of business, allowing an unauthorized individual in the store, or for allowing customers to access the store while it was closed for business.  (Id. at PageID 1395.)  In fact, Taylor testified that she previously told by Manager Page to unlock a locked door when the store was closed for business to let a customer in to "see what she wanted," which ultimately involved a mobile order.  (Id. at PageID 1424.)

### D.  Off-Duty Partner Accessing Safe

Testimony indicated that the safe access policies were also not rigidly enforced.  For instance, former Store Manager Holden testified that, while improper for someone to access the safe while unauthorized persons were behind the line, she was unaware of any partner receiving

discipline for briefly leaving the safe open and unattended.  (ECF No. 73 at PageID 1451, 1442.)

Moreover, while Sanchez stated that Starbucks' policy prohibited shift supervisors from using

other shift supervisors' codes to the safe (their "PIN"), he testified that Store Manager Page and

District Manager Morton were aware that three shift supervisors – McGlawn, Throckmorton and

Taylor – were not given their own designated PINs; in his words, the shift supervisors "had

requested frequently to both Elizabeth [Page] and Cedric [Morton] and never ended up receiving

one because they would still have to communicate with me for [using] my PIN."  (Id. at PageID

1525.)  When Sanchez raised the partners' lack of PIN access with Page, she said that she would

"take care of it," but never did.  (Id. at PageID 1523.)  He testified that Page actually asked him

to share his PIN with Throckmorton and McGlawn.  (Id. at PageID 1539.)

Sanchez testified to previous non-enforcement of the policy.  He stated that he had

accessed the safe and assisted with cash handling for Brinks Security personnel while off-duty on

two previous occasions, when partners Throckmorton or McGlawn were on-duty shift

supervisors, because he was the only partner with a PIN able to complete the transfer.  (ECF No.

73 at PageID 1528.)  As for Taylor, Sanchez testified that she had to use a "different shift

[supervisor]'s PIN," one registered to a former shift supervisor who no longer worked at the

store.  (ECF No. 73 at PageID 1524.)

**VIII.    Increased Management Oversight**

The Board alleges that Starbucks heightened the presence of management in the store

after the Union campaign was publicly announced, beginning before the terminations and

continuing afterward.

Holden testified that, between September and November 2021 when she was at the

Memphis Store, District Manager Morton rarely visited the store.  (ECF No. 73 at PageID 1439.)

Hall testified that she had only seen Store Manager Page once or twice on a weekend since November 2021 until the terminations took place in February 2022. (Id. at PageID 1484.) However, after the union petition was filed and the campaign announced, Taylor – who worked in the store five to six days per week – stated that she saw District Manager Morton almost daily in the Memphis Store. (Id. at PageID 1392, 1394.) Hall testified that she saw Store Manager Page in the Memphis Store on the weekends after the terminations.

On February 9, 2022, the Memphis Store opened as drive-thru only. (Id. at PageID 1473-74.) Hall stated that the café closure was due to "a third of [her] staff" being fired" the day before, and the Store remained drive-thru only for a "few weeks." (Id. at PageID 1474, 1480.) Yet, despite the lobby café being closed, multiple managers came to the store every day for a few weeks to work there – including Morton, Page and other store managers from other Memphis locations that Hall or other partners recognized. (Id. at PageID 1480-81.) At times, three managers were there together; they also came on weekends, departing from past behavior. (ECF No. 73 at PageID 1482-84.) Hall testified that these visiting managers did not provide them with any direction, and she was not told why they were at the store. (ECF No. 73 at PageID 1483.) They continued this behavior beyond the period of time when the store was drive-thru only. (Id. at PageID 1483.) Regional Director Line, in contrast, stated that it is "common" for store managers to work together, including to do computer work. (See ECF No. 75 at PageID 1075-76.)

## LEGAL STANDARD

The Board brought this action under § 10(j) of the NLRA, which authorizes the Board, upon issuance of an administrative complaint alleging an unfair labor practice, to petition a district court for "such temporary relief or restraining order as it deems just and proper" pending

18

the outcome of the administrative proceedings.  29 U.S.C. § 160(j).  To grant such relief, a district court must make two findings.  First, it must find "reasonable cause" to believe that an unfair labor practice has occurred.  Muffley, 551 F. App'x at 827 (citing Ahearn v. Jackson Hosp. Corp., 351 F.3d 226, 234 (6th Cir. 2003)).  Second, if the district court finds reasonable cause, it must then determine whether injunctive relief is "just and proper."  Id.[8]  Because the Board adjudicates the unfair labor practices charges, thereafter subject to judicial review, a court evaluating a § 10(j) petition may not adjudicate the merits of such charges.  Id.

## ANALYSIS

Whether there is "reasonable cause" supporting each of the five unfair labor practices alleged by the Board is first considered below, and the Court concludes that the Board has met its relatively insubstantial burden to establish reasonable cause as to each.  Next, the Court finds that most of the requested injunctive relief is "just and proper."  The Court therefore **GRANTS** the Petition **IN PART**, ordering Starbucks to abide by the directives outlined below.

### I.     Reasonable Cause

The Board's burden to establish reasonable cause is "relatively insubstantial."  Muffley, 551 F. App'x at 830.  It must support its petition with "some evidence," but "need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous."  Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 29 (6th Cir. 1998).  The facts of the case must, however, "be consistent with the Board's legal theory."  Muffley, 551 F. App'x at 827 (citing Ahearn, 351 F.3d at 237).  Thus, there are two questions to consider: first, is

---

[8] Starbucks urges the Court to consider traditional equitable criteria in its analysis, but the Sixth Circuit has rejected this approach.  See Glasser ex rel. NLRB v. ADT Sec. Servs., Inc., 379 F. App'x 483, 485, n.2 (6th Cir. 2010) (distinguishing its approach from circuits incorporating traditional equitable criteria for injunctions into the "just and proper" element).

the legal theory substantial?  And, second, are the facts supportive of the Board's legal theory?

As it is only required to evaluate whether facts exist to support the Board's theory of liability, the

Court may not "resolve conflicting evidence or weigh credibility in a § 10(j) proceeding." <u>Id</u>.

Because the Board offered proof of facts that support the Board's substantial legal theory,

reasonable cause exists.

### A.  Is the legal theory substantial?

Section 8(a) of the NRLA provides, in pertinent part:

It shall be an unfair labor practice for an employer –
> (1) to interfere with, restrain, or coerce employees in the exercise of the rights
> guaranteed in section 7;
> . . . [and]
> (3) by discrimination in regard to hire or tenure of employment or any term or
> condition of employment to encourage or discourage membership in any labor
> organization; . . .

<u>See</u> 29 U.S.C. §§ 158(a)(1) and (3).

The Board contends that Starbucks violated §§ 8(a)(1) and (3) of the NLRA by:

(a) issuing discipline to lead organizer Nikki Taylor after hearing her discussing organizing

union meetings, (b) closing the lobby of the Memphis Store to obstruct customers from

participating in a union sit-in campaign, (c) removing pro-union literature from the community

bulletin board, (d) increasing managerial monitoring after employees publicly announced their

intent to organize, and (e) terminating the Memphis Seven after they engaged in pro-union

activity.  (ECF No. 84 at PageID 1748.)  In support, it applies the <u>Wright Line</u> test for

discriminatory action, under which the Board bears the burden of establishing a prima facie case

by showing that "(1) the employee was engaged in protected activity; (2) that the employer knew

of the employee's protected activity; and (3) that the employer acted as it did on the basis of anti-

union animus."  <u>Airgas USA, LLC v. NLRB</u>, 916 F.3d 555, 561 (6th Cir. 2019) (applying the

burden-shifting framework articulated in <u>Wright Line</u>, 251 N.L.R.B. 1083 (1980), adopted by the Supreme Court in <u>NLRB v. Transp. Mgmt. Corp.</u>, 462 U.S. 393 (1983)).  If a prima facie case is established, the employer must prove "by a preponderance of the evidence that the employee would have been [disciplined] for permissible reasons even if he had not been involved in activity protected by the [Act]."  <u>Id</u>. (quoting <u>NLRB v. Overseas Motor, Inc.</u>, 721 F.2d 570, 571 (6th Cir. 1983)).

Starbucks does not oppose the NLRB's reliance on the <u>Wright Line</u> test.  (ECF No. 85 at PageID 1764 (challenging only Petitioner's evidence to support establishing reasonable cause).)  Thus, the legal theory is "substantial."  The next inquiry focuses on whether there exist facts supporting each allegation, without weighing credibility or resolving conflicts in the evidence.

### B.  Do the Facts Support Petitioner's Legal Theories?

To establish a violation of §§ 8(a)(1) and (3) of the NLRA, the Board must first make out a prima facie case of discrimination, demonstrating that (1) the employee engaged in protected activity (2) of which the employer was aware and (3) the employer acted as it did based on anti-union animus.  <u>Airgas</u>, 916 F.3d at 561.  The last element of establishing a prima facie case of discrimination, anti-union animus, "may be 'inferred from circumstantial as well as direct evidence.'"  <u>Id</u>.  Certain circumstantial factors supporting a finding of animus include: "the company's expressed hostility towards unionization combined with knowledge of the employees' union activities; inconsistencies between the proffered reason for [discipline] and other actions of the employer; disparate treatment of certain employees compared to other employees with similar work records or offenses; a company's deviation from past practices in implementing the [discipline]; and proximity in time between the employees' union activities and their [discipline]."  <u>Id</u>. (citing <u>W.F. Bolin Co. v. NLRB</u>, 70 F.3d 863, 871 (6th Cir. 1995)).

If a prima facie case is established, then the burden shifts to the employer to establish, by a preponderance of the evidence, that there was a permissible justification for the discipline unrelated to the protected activity.  Id.; see also Ozburn-Hessey Logistics, LLC v. NLRB, 803 F. App'x 876, 884 (6th Cir. 2020).  "If 'the employer's proffered justification for the decision is determined to be pretextual, the Board is not obligated to consider whether the employer would have [made] the same decision regardless of the employee's union activity.'"  Id. (quoting Ctr. Constr. Co. v. NLRB, 482 F.3d 425, 435–36 (6th Cir. 2007)).

"Motive is a factual matter" in NLRB proceedings, and the Court, in this circumstance, is especially aware of heeding the requirement not to make factual findings or resolve factual inconsistencies.  See NLRB v. Mini-Togs, Inc., 980 F.2d 1027, 1032 (5th Cir. 1993).  "The Board's inference of improper motivation must be upheld if it is reasonable in light of the proven facts."  Birch Run Welding & Fabricating, Inc. v. NLRB, 761 F.2d 1175, 1179 (6th Cir. 1985).

The evidence offered in support of the Board's legal theory for each allegation is outlined below.

### 1.  Issuing Discipline to Taylor

The Board argues that there is reasonable cause to believe that Starbucks retaliated against Taylor for organizing the Memphis Store by issuing two disciplinary write-ups.  (ECF No. 1-3 at PageID 263.)   Specifically, it argues that it establishes a prima facie case of discrimination because (1) Taylor engaged in protected activity "by talking with her coworkers about unions, working conditions, and their interest in starting a campaign at the store;" (2) Starbucks was aware of that activity; and (3) Starbucks' issuance of two disciplinary write-ups was motivated by animosity it harbored against Taylor's activity.  (Id. at PageID 263-64.)

Further, the Board contends that Starbucks' affirmative defense that it disciplined Taylor for policy violations is pretextual.  (ECF No. 82 at PageID 1701.)

In response, Starbucks argues that District Manager Morton only issued one corrective action regarding Taylor's pattern of communication, and he was unaware of her organizing activity when doing so.  Without knowledge, Starbucks argues there is no reasonable cause. (ECF No. 81 at PageID 1693.)  Additionally, even if Morton did have knowledge, Starbucks contends that there is no evidence that the disciplinary action was retaliatory "except for the timing," which is in itself insufficient.  (Id.)

Because Starbucks does not challenge Taylor's engagement in protected activity, the question becomes whether Starbucks was aware of it.  The Board argues that, "[g]iven the presence of surveillance cameras in the store, the pointed questioning by Managers Page and Poindexter, the small size of the store, and the fact that at least six of about twenty employees discussed organizing during a concentrated period of time, Starbucks' knowledge of Taylor's protected activities may reasonably be inferred."  (ECF No. 1-3 at PageID 265.)  It offers Taylor's testimony for proof of Starbucks' knowledge, including her open conversations in the Memphis Store with other partners about union activity occurring in the presence of managers. (ECF No. 82 at PageID 1700; see ECF No. 73 at PageID 1363-64) ("Q: Were any managers present in the Memphis Store when you discussed organizing with partners? Several times . . . Elizabeth Page, Mia Poindexter and also Cedric Morton.").)  Relying on the small-plant doctrine,[9] the Board argues that these conversations, held in the intimate working environment of

---

[9] "The essence of the small plant doctrine 'rests on the view that an employer at a small facility is likely to notice union activities at the plant because of the closer working environment between management and labor.'"  NLRB v. Health Care Logistics, Inc., 784 F.2d 232, 236 (6th Cir. 1986) (quoting Alumbaugh Coal Corp. v. NLRB, 635 F.2d 1380, 1384 (8th Cir. 1980)).

the Memphis Store, bolster the inference that Starbucks' managerial staff knew about Taylor's

activity. (ECF No. 82 at PageID 1700, n.3 (citing NLRB v. Roemer Indus., Inc., 824 F. App'x

396, 404 (6th Cir. 2020)).)

In rebuttal, Starbucks relies on District Manager Morton's testimony that he was unaware

of any organizing activity in the Memphis Store until the morning after the January 18 media

event and had not heard anything from Store Manager Page or Assistant Manager Poindexter

regarding organizing activity. (ECF No. 81 at PageID 1668 (citing ECF No. 75 at PageID

1162).) Starbucks argues that, "[a]s the final decision-maker, it is Morton's knowledge of

organizing activity that is outcome determinative," and the Board furnished no evidence that

Morton was aware of the union activity or that information about organizing activity was

conveyed to him. (ECF No. 82 at PageID 1692-93.)

The Board presented sufficient evidence supporting its position that Starbucks knew

about Taylor's pro-union activity when Morton disciplined her. Taylor's testimony that Morton

was present at the Memphis Store when she discussed union organizing; that Morton's direct

report, Manager Page, and her direct report, Assistant Manager Poindexter, interacted with

Taylor when she was discussing union activity; and the working environment in which all

Memphis Store partners worked in "close proximity," (ECF No. 73 at PageID 1366), supports

the Board's assertion that Morton knew about Taylor's union activity. See Roemer, 824 F.

App'x at 404 ("The inference [of knowledge] was proper here in light of other circumstantial

evidence . . . that Roemer had 'reason to notice the union activities.'") (citing Health Care

Logistics, 784 F.2d at 236). While Morton denies knowledge of Taylor's activities at the time

of the discipline, it is not the role of the Court to resolve the conflicting testimony. Thus, the

evidence is sufficient to find that the Board satisfied its "relatively insubstantial" burden to provide facts supportive of the theory that Morton knew about Taylor's union activity.

Turning to the remaining prong, anti-union animus, the Board argues that Taylor did not engage in behavior subject to discipline and that the relevant policies were selectively enforced against her, offering evidence that Starbucks did not take otherwise routine steps to address the alleged violations and tolerated similar conduct by others.  (ECF No. 82 at PageID 1701-02; see ECF No. 1-2 at PageID 168; ECF No. 73 at PageID 1435.)   In response, Starbucks argues that the Board presents no evidence, other than timing, to establish that the disciplinary action was retaliatory, which is insufficient given Taylor's pattern of misbehavior and Starbucks' right to address that behavior.  (ECF No. 81 at PageID 1693.)

The facts presented in affidavits and testimony at the hearing are consistent with the Board's theory of anti-union animus.  Further, even though Starbucks had a dress code policy and a policy of addressing negative behavior, there is evidence that supports the Board's theory that the discipline was pretextual.

First, according to the evidence, Taylor was issued discipline the second week of January, after engaging in open union activity earlier in the month.  (See Exhibits 1 & 2); FiveCAP, Inc. v. NLRB, 294 F.3d 768, 777 (6th Cir. 2002) (finding that proximity in time contributed to finding anti-union animus).  Second, although Store Manager Page told Taylor that, "in practice, we would have a conversation with a partner before we had any disciplinary on them[,]" and although former Store Manager Holden testified that a partner in non-compliant clothing would be sent home to change before being issued corrective action, Taylor testified that she was not given a prior warning or talked to before her write-up.  (ECF No. 73 at PageID 1380-81, 1435); see Bolin, 70 F.3d at 871 (employer deviation from past practice may be a basis to infer animus).

25

There is also no evidence that she was sent home to change before the discipline.  Finally, Taylor states that, to her knowledge, another partner with non-compliant clothes was not issued a write-up for the same infraction only a few days later.  (Id. at PageID 1381-82; see Bolin, 70 F.3d at 871 (disparate treatment of employees can contribute to finding animus).)

As for the "communication" discipline, Taylor denies engaging in any passive aggressive behavior toward Store Manager Page or using inappropriate language in the Store.  (ECF No. 1-2 at PageID 169-173.)  She maintains that she had not heard of any discipline issued against partners who engaged in allegedly similar conduct of having an inappropriate conversation or failing to uphold Starbucks' respectfulness standards.  (Id. at PageID 173.)

Even if Starbucks only issued one disciplinary write-up, as Starbucks contends, factual inconsistencies are for the Board to review in its administrative proceeding, not for the Court to resolve here.  Given the timing of the discipline, Taylor's denial of the violations and testimony supporting inconsistent policy applications, the Board met its burden to offer evidence that supports reasonable cause that Starbucks violated § 8(a)(3) of the NLRA in issuing discipline against Taylor.

### 2.  Obstructing the Sit-In Campaign

Second, the Board argues that there is reasonable cause to believe that Starbucks closed the lobby service at the Memphis Store for three days – from January 21 to 23, 2022 – to interfere with a union sit-in campaign scheduled for those days.  (ECF No. 1-3 at PageID 266.)  It argues that Starbucks made this decision while aware of the partners' previous union activity and their advertisement of the campaign.  Further, the Board asserts that Starbucks' proffered reason of "short staffing" for closing the lobby was simply pretext, as Starbucks inconsistently

closed the lobby due to staffing shortages and there were sufficient partners working that weekend to keep the lobby open.

In response, Starbucks argues its lack of knowledge and lack of discriminatory motive.  It relies on the "very severe staffing crisis" that the Store underwent in January 2022, forcing it, as a policy response, to turn off channels of business to maintain operations.  (ECF No. 81 at PageID 1693 (citing ECF No. 75 at PageID 1072).)  Starbucks cites to testimony by its managers that they were unaware of planned sit-ins when making that decision.  (ECF No. 81 at PageID 1694 (citing ECF No. 75 at PageID 1074, 1160).)

As to knowledge, the Board provides "some evidence" to support that Starbucks was aware of the sit-in campaign before it took place.  The record supports that, on January 19, 2022, the Union and members of the employee organizing committee organized a sit-in for the January 21-23 weekend and advertised it on social media channels including Twitter and Instagram before the weekend.  (ECF No. 73 at PageID 1382-83, 1419, 1460; see Exhibit 5, Flyer.)  Regional Director Line testified that she "[m]aybe" follows "[a] few" partners in her stores on Instagram, in which case she could have seen Hall's advertisement.  (ECF No. 75 at PageID 1074.)  Additionally, while Morton testified that he decided to shut down the café area before knowing about the sit-in, (id. at PageID 1160), he also stated that he became aware of the sit-in campaign before the weekend began, and still enforced the closure.  Finally, all of the Memphis Store managers were aware of general union activity as the partners had taken their campaign public that week.  (Id. at PageID 1037.)  The Board's proffered evidence is supportive of its theory that Starbucks was aware of protected activity when making this decision.

In addition, the record supports the existence of anti-union animus.  First, the decision to close the café was made only days after the public announcement of the union campaign and

after the advertisement was publicized – timing that lends support for a discriminatory motive. See FiveCAP, Inc., 294 F.3d at 777-78.  So, too, does the specific tailoring of the closure; Starbucks chose to close the lobby café instead of closing online orders, and chose to close the lobby café precisely on the days that the sit-in was to occur.

Further, while Starbucks offers the justification that "short staffing" caused the closure, there is support in the record that the real reason was interference with union activity, not an understaffed store.  Indeed, the Board offered testimony that Starbucks did not need to close the lobby that weekend because the store was appropriately staffed those days; and that, faced with a staffing shortage on January 24, 2022, just one day after the sit-in campaign, Starbucks chose not to follow the same policy and instead kept the store's lobby open.   (ECF No. 73 at PageID 1465, 1469.)  Even though Starbucks emphasizes that Morton did not re-close the café when Hall and Sanchez opened it midday on the Saturday of the sit-in weekend, when the store was sufficiently staffed, testimony indicated that he also reminded the partners that the café "was supposed to stay closed no matter what"— indicating support for the theory that whether there were appropriate staffing levels did not impact the decision to close the store.  (Id. at PageID 1465.)

Moreover, the evidence that protest signs were allowed to be made in the lobby of the Memphis Store on January 22nd when Sanchez and Hall opened the lobby does not change the Board's evidence supporting its theory that "short staffing" was a pretextual justification for closing the lobby.  The Court therefore concludes that there is reasonable cause to believe that Starbucks violated § 8(a)(1) by interfering with the union's sit-in campaign.

28

### 3.   Removing Union Literature from Community Bulletin Board

The Board further argues that there is reasonable cause to believe that Starbucks' next retaliatory acts were (1) to disparately apply a previously unenforced policy to remove Union-oriented material from the bulletin board days before removing other material and (2) to tell employees that they violated company policy by posting pro-union notes on the board, in violation of § 8(a)(1) of the NLRA.  (ECF No. 1-3 at PageID 269.)

Not contesting the first two prongs of the Wright Line test, Starbucks only challenges the Board's argument that it acted with anti-union animus.  It argues that the removal of pro-Union posters was "in accordance with its policy that political materials be removed and . . . its policy that the board should be regularly refreshed," particularly because pro-Union posters "limit[ed] the ability of other customers to use the board for approved purposes."  (ECF No. 81 at PageID 1695 (citing, inter alia, Mek Arden, LLC d/b/a Arden Post Acute Rehab, 365 N.L.R.B. No. 110, slip op. 1, n.3 (June 25, 2017) (quoting Register Guard, 351 N.L.R.B. 1110 (2007), enforced in part, 571 F.3d 53 (D.C. Cir. 2009) (holding that "discrimination" against union materials means "the unequal treatment of equals.")); see Exhibit 25, Starbucks Store Operations Manual).

In support of a finding of anti-union animus, the Board emphasizes that partners testified about previously being allowed to post items on the bulletin board and about Starbucks' noncompliance with its stated policy regarding the bulletin board.  It argues that there was not a previous practice of removing individual items from the board (other than outdated material), nor all of the items at once, yet when partners posted customers' notes of pro-union support, that policy of removal was abruptly applied.  (ECF No. 82 at PageID 1703; see ECF No. 73 at PageID 1388-1390.)

The record includes evidence consistent with the Board's theory of anti-union animus, and, in the alternative, pretextual application of an otherwise unenforced policy.  Therefore, the Court finds reasonable cause to believe that Starbucks violated § 8(a)(1) of the NLRA by removing the pro-union literature.

### 4.  Increasing Managerial Oversight

The Board argues that there is reasonable cause to believe that Starbucks monitored the partners engaged in union activity more closely when it significantly increased the frequency and length of time their managers spent at the Memphis Store following the public announcement of the organizing campaign.  (ECF No. 1-3 at PageID 267-68); see Gold Kist, Inc., 341 N.L.R.B. 1040, 1040 (2004) (finding it unlawful under the Act for an employer to monitor employees more closely following engagement in union activity).  It also argues that Starbucks' justification of needing more managers to conduct interviews related to the January 18 investigation is belied by the length of time that the managers spent in the Memphis Store and the presence of rotating managers who did not participate in the interviews.  (Id. at PageID 268.)

In response, Starbucks does not argue that the time spent and number of managers at the Memphis Store did not increase following the union announcement; instead, it contends that this conduct is not "so out of the ordinary that it creates the impression of surveillance or constitutes improperly increased supervision" under prevailing law.  (ECF No. 81 at PageID 1696 (citing Bellagio, LLC v. NLRB, 854 F.3d 703, 711 (D.C. Cir. 2017); Charter Commc'ns, Inc. v. NLRB, 939 F. 3d 798, 811 (6th Cir. 2019)).)

The Court agrees with the Board.  Prohibitions under § 8(a)(1) regarding increased supervision do not "prevent employers from observing public union activity, particularly where such activity occurs on company premises so long as the employer does not engage in conduct

that is so out of the ordinary that it creates the impression of surveillance." <u>Bellagio</u>, 854 F.3d at 711.  Indeed, an employer may "mere[ly] observ[e]" union activity without that observation constituting unlawful surveillance.  <u>Charter Commc'ns, Inc.</u>, 939 F.3d at 811.  To determine when an employer's supervision becomes unlawful, the Board considers "the duration of the observation, the employer's distance from its employees, and whether the employer engaged in other coercive behavior during its observation."  <u>Aladdin Gaming, LLC</u>, 345 N.L.R.B. 585, 586 (2005), <u>aff'd</u> <u>sub</u> <u>nom</u>, <u>Local Joint Exec. Bd. of Las Vegas v. NLRB</u>, 515 F.3d 842 (9th Cir. 2008).  When unlawful supervision occurs, the "union activity need not be 'personally seen' during the close supervision; the question is whether the supervision is motivated by earlier union activity."  <u>Charter Comm'cns, Inc.</u>, 939 F.3d at 813.  Here, there is evidence supporting a conclusion that the question be answered affirmatively.

The Board presented evidence that there was a different level of supervision before the announcement of the union campaign and the media event on January 18 than there was after these events.  For instance, Holden testified that, between September and November 2021, when she was at the Memphis Store, District Manager Morton only visited the store rarely, (ECF No. 73 at PageID 1439), but, after the union campaign became public, Taylor testified that she saw District Manager Morton almost daily in the Memphis Store.  (ECF No. 73 at PageID 1392, 1394.)  Further, whereas Hall also testified that Store Manager Page rarely made weekend appearances at the Store, after the public union activity she saw her frequently in the Memphis Store on weekends.  (ECF No. 73 at PageID 1484.)

While the increased attentiveness of the Memphis Store managers is some evidence of increased supervision, the increased number of rotating managers from <u>other</u> stores supports reasonable cause that the increased supervision was motivated by pro-union activity.  The Board

presented testimony that other store managers did indeed visit and spend long periods of time at the Memphis Store with no explanation for their presence.  (ECF No. 73 at PageID 1480-83.) The Court finds this evidence consistent with "creat[ing] the impression of surveillance," see Bellagio, 854 F.3d at 711, and therefore finds reasonable cause that Starbucks increased its supervision in violation of § 8(a)(1) of the NLRA.

### 5.  Terminating the Memphis Seven

Lastly, the Board argues that there is reasonable cause to believe that the Memphis Seven "would not have been discharged but for the fact that they engaged in protected activity," including but not limited to the January 18 media event.  (ECF No. 82 at PageID 1703); see Kentucky Gen., Inc. v. NLRB, 177 F.3d 430, 435 (6th Cir. 1999) (finding that an employer violates § 8(a)(3) of the Act when it discharges employees due to their union support).  It contends that the discriminatory and pretextual nature of the discharges is rooted in Starbucks' inconsistent, selective enforcement of its policies in relation to all of the partners' union activity, and an inference of animus is supported by the timing of the terminations in close proximity to the union activity.  (ECF No. 82 at PageID 1704.)

In response, Starbucks contends that the company never previously tolerated similar conduct to that involved in the January 18 event; instead, the nature of the partners' violations was "extraordinarily different" from the Board's comparators and the subsequent discharges were appropriately consistent with past practice involving similar levels of violations.  (ECF No. 85 at PageID 1763 (citing ECF No. 75 at PageID 1068-69).)  Moreover, it urges the Court not to rely on unproven allegations of other unfair labor practices to demonstrate anti-union animus in this instance.  (ECF No. 85 at PageID 1764 (citing Dresser-Rand Company v. NLRB, 838 F.3d

512 (5th Cir. 2016)).)  Again, the first two prongs of the <u>Wright Line</u> test are unchallenged, leaving the question of anti-union animus as the focus here.

Both to demonstrate animus and to establish pretext for Starbucks' policy reasons for the terminations, the Board emphasizes the (1) proximity of the timing of the discharges to the partners' engagement in union activity, including but not limited to the January 18 media event, (2) previous tolerance of policy violations that Starbucks now deems terminable, and (3) disparate treatment of the discharged partners compared to those who previously violated the relevant policies.  (ECF No. 82 at PageID 1703-04.)

First, the Board presented evidence that the terminations occurred three weeks after the January 18 media event, and even closer to when partners engaged in the sit-in campaign and posted pro-Union materials on the community bulletin board.  While timing alone is insufficient to infer animus, it is one supportive circumstantial factor.  <u>See Airgas</u>, 916 F.3d at 561.

As for policy enforcement, the Board offered testimony that Starbucks tolerated off-duty employees remaining in the store – or going behind the counter or in the back office area – to make drinks, collect belongings, and assist each other with safe access after closing. Specifically, Taylor testified that she engaged in these actions without discipline and had not otherwise received training for how to handle filming requests, (ECF No. 73 at PageID 1394-95, 1396-97); Holden testified that these policy violations, including accessing the safe while off-duty or when non-employees are present, were routinely tolerated, (<u>id</u>. at PageID 1425-26); Hall testified that she was unaware of a written policy prohibiting partners from going behind the counter or to the back of house after hours, until after the discharges, (<u>id</u>. at PageID 1485); and Sanchez testified that he accessed the safe and assisted with cash handling while off-duty on two previous occasions as the only partner with a PIN able to complete the transfer.  (<u>Id</u>. at PageID

1526-28).  (ECF No. 82 at PageID 1704-05.)  Such tolerance before union activity, but terminations resulting thereafter, supports an inference of discriminatory motive.  See Airgas, 916 F.3d at 561.

Further, the Board urges the Court to reject Starbucks' rebuttal evidence that these terminations were in line with other terminable violations because that testimony raises conflicts in the evidence and issues of witness credibility that the Court cannot resolve; instead, it "should accept the record evidence presented by Petitioner as long as facts exist which could support the Petitioner's legal theory."  (ECF No. 84 at PageID 1748-49 (citing, e.g., Ahearn, 351 F.3d).)

In response, Starbucks argues that it had legitimate, non-discriminatory policy reasons for terminating each partner after conducting a thorough investigation into their actions.  According to District Manager Morton, who made the decision to terminate the seven partners, (ECF No. 75 at PageID 1140), they were all terminated for varying involvement in (1) being in the store while off-duty; (2) entering the back of house or behind the counter while off-duty; (3) for Taylor, unlocking a locked door to allow an unauthorized person to enter while off-duty; (4) for Sanchez, activating the safe and handling cash while off-duty; and (5) for McGlawn, allowing the previous actions to occur.  (Id. at PageID 1142-1152; see Exhibits 9, 39-44.)  In support, Starbucks provides evidence that it "verified that the partners had been trained or given a Partner Guide addressing the policy violations for which they were discharged," and that the partners largely do not dispute that they committed these acts.  (ECF No. 81 at PageID 1688 (citing ECF No. 75 at PageID 1128; Exhibit 53).)

Starbucks also contends that its actions were in line with its past actions regarding employees who committed such policy violations.  In contrast to partners who committed the same policy violations in name, but to a lesser, "extraordinarily different" degree, Starbucks

34

argues that it had previously terminated partners who engaged in similar conduct when Starbucks knew of the violations and when the violations occurred after hours.  (Id. at PageID 1690.)  To rebut the Board's argument that there was inconsistent enforcement of safe and cash-handling policies, Starbucks argued that any inconsistency was immaterial because partners were not discharged for the violation of code-sharing, and blamed the inconsistencies on previous Store Manager Holden.  (Id. at PageID 1691.)

Finally, Starbucks argues that the timing of the violations does not create an inference of anti-union animus because the "[d]ischarged [p]artners' policy violations, and Starbucks' investigation of them, are critical intervening events that render any inference of animus based on timing alone null."  (Id. at PageID 1691 (citing Dallas & Mavis Specialized Carrier Co., 346 N.L.R.B. 253 (2006) (timing is not evidence of anti-union animus when there is evidence the decision was motivated by an intervening event that would justify disciplinary action)).)

The Board's evidence provides reasonable cause to support the conclusion that Starbucks violated § 8(a)(3) of the Act by terminating the Memphis Seven because it provides evidence consistent with the theory that Starbucks discriminatorily applied its policies to the Memphis Seven when terminating them.  Specifically, the evidence offered supports inconsistent enforcement of the policies at issue and, as to the duties related to the safe and handling of cash, knowing approval of policy violations by management.

Moreover, assuming arguendo that Starbucks' policy justifications – including safety concerns – are legitimate, the Board provides evidence consistent with the theory that Starbucks' policy justifications were pretextual.  For instance, terminating partners for being in the store after closing, or even unlocking a door to allow media personnel (with identification) into the store, on the basis of safety concerns appears to be a pretextual justification when there is no

evidence in the record to support the existence of any safety concerns that night.  (ECF No. 73 at PageID 1424.)  Starbucks' tolerance of similar conduct in instances other than the night of January 18 also lends support for the Board's pretext argument.

Finally, the Court disregards Starbucks' offering of evidence that other employees were similarly terminated for such offenses, for two reasons.  (See ECF No. 75 at PageID 1289-93; Exhibit 54.)  First, the evidence offered is inconsistent with the Board's proffered testimony that similar conduct at the Memphis Store was previously tolerated.  Second, Starbucks did not offer testimony that these comparable offenses actually played any role in the investigation into the January 18 incident or that Morton used these comparable circumstances to come to his decision to terminate the employees.

## II.      Just and Proper

Having found reasonable cause supporting the conclusion that Starbucks committed the alleged violations, the question becomes whether injunctive relief is "just and proper" to protect the NLRB's remedial power.  The Board seeks a cease and desist order, instructing Starbucks to end its unlawful acts, and other related relief, including temporarily reinstating the terminated employees, rescinding the discipline issued to Taylor, and reading aloud, posting, and distributing the Court's Order both in the Memphis Store and nationally.

A temporary injunction is just and proper when it is "necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible."  McKinney v. Ozburn-Hessey Logistics, LLC, 875 F.3d 333, 339 (6th Cir. 2017).   Returning to the status quo requires returning the parties to their relevant positions before the alleged violations occurred, not to their positions when the petition was filed.  Fleischut, 859 F.2d at 30 n.3.  Further, "the relief to be

granted is only that reasonably necessary to preserve the ultimate remedial power of the Board, and is not to be a substitute for the exercise of that power." Gottfried v. Frankel, 818 F.2d 485, 494 (6th Cir. 1987) (quoting Kobell v. Suburban Lines, Inc., 731 F.2d 1076, 1084 (3rd Cir. 1984)).  Therefore, "[i]nterim judicial relief is warranted whenever 'the circumstances of a case create a reasonable apprehension that the efficacy of the Board's final order may be nullified, or the administrative procedures will be rendered meaningless.'" Sheeran v. Am. Com. Lines, Inc. 683 F.2d 970, 979 (6th Cir. 1982) (quoting Angle v. Sacks ex rel. NLRB, 382 F.2d 655, 660 (10th Cir. 1967)).

Because the "just and proper" determination is "fact-intensive and complex," it "could certainly cause reasonable minds to differ." Lindsay v. Mike-Sell's Potato Chip Co., No. 3:17-CV-126, 2017 WL 5257126, at *4 (S.D. Ohio Nov. 13, 2017).  Having the judicial discretion to determine whether this standard has been met, courts must explain the reasons for their determinations.  See Calatrello v. Automatic Sprinkler Corp. of Am., 55 F.3d 208, 214 (6th Cir. 1995); Fleischut, 859 F.2d at 30.  As explained below, a temporary injunction as to some, but not all, relief sought is necessary here to return the parties to the status quo, pending the Board's proceedings.

### A.  Reinstatement

The Board argues that reinstatement of the Memphis Seven is just and proper because it will return the Parties to the environment of open union support that existed before Starbucks engaged in its pattern of unlawful conduct.  (ECF No. 84 at PageID 1742.)  Absent reinstatement, the Board argues that (1) the "residual chilling impact" of the mass discharge harms the partners' ability to openly support the union as members of the bargaining committee, and (2) the lack of daily contact between current partners and the Memphis Seven harms the

37

interim bargaining process with the newly-certified Union.  (ECF No. 84 at PageID 1742 (citing Frankl v. HTH Corp., 650 F.3d 1334, 1364 (9th Cir. 2011)).)

In response, Starbucks contends that reinstatement is not just and proper because "the purposes of the Act have not been frustrated, . . . there is no credible evidence of an erosion of support for the Union . . . [as] the Union has been elected the bargaining representative for the Memphis Store, the Union's nationwide campaign continues unabated, and the Discharged Partners are . . . participating in collective bargaining."  (ECF No. 81 at PageID 1674.)

The Court agrees with the Board that reinstatement of the Memphis Seven is just and proper.  Interim reinstatement of employees is a permissible exercise of judicial discretion under § 10(j) when it is reasonably needed to preserve the Board's remedial power to be exercised at the conclusion of the administrative proceedings.  Muffley, 551 F. App'x. at 835.  The Board's remedial power is impacted if "the termination of respondent's employees resulted in a 'chilling effect' on co-employees."  Lightner v. Dauman Pallet, Inc., 823 F. Supp. 249, 253 (D.N.J. 1992), aff'd mem., 993 F.2d 877 (3d Cir. 1993).  The "chilling effect" – or, in other words, the "erosion of support for a nascent union movement," see Pye ex rel. NLRB v. Excel Case Ready, 238 F.3d 69, 74–75 (1st Cir. 2001) – is even more salient when an employer discharges "active and open union supporters" or the members of a bargaining committee.  See Kaynard for & on Behalf of NLRB v. Palby Lingerie, Inc., 625 F.2d 1047, 1053 (2d Cir. 1980); Pascarell v. Vibra Screw, 904 F.2d 874, 880 (3d Cir. 1990) (noting that the employer's discharge of the entire bargaining committee rendered the chilling effect on other non-activist employees obvious).  Faced with the risk of chill when these employees are terminated, "the need for interim relief is heightened" when a union is newly certified, yet the employer and union "have yet to achieve an initial collective bargaining agreement covering the . . . employees."  Lund v. Case Farms

Processing, Inc., 794 F. Supp. 2d 809, 822 (N.D. Ohio 2011).  In that circumstance, employees

are "highly susceptible" to unfair labor practices.  Id. (citing Calatrello v. General Die Casters,

No. 1:10-CV-2421, 2011 WL 446685, at *8 (N.D. Ohio Jan. 11, 2011) (internal citations

omitted)); see also Eisenberg v. Wellington Hall Nursing Home, 651 F.2d 902, 907 (3d Cir.

1981) (failure to reinstate terminated employees who were supporters of union undermines

union's ability to represent all members during bargaining sessions).

      Here, there is evidence in the record that the terminations included the active and open

leadership of the organizing effort, with the terminated partners consisting of over 80% of the

union's organizing committee.   In December 2021 and January 2022, the organizing effort was

growing, with a six-person leadership team collecting union authorization cards from the

majority of partners at the Memphis Store.  That leadership team involved Taylor, the self-

proclaimed "mama in the store" and "most organized" partner, who testified that she was a "big

influence in the [Memphis] store at the time."  (ECF No. 73 at PageID 1401.)  Facilitated by her

leadership, the union organizers and other Memphis Store partners wore their union pins at work,

discussed union activity at the Memphis Store and involved sympathetic community members.

(See, e.g., id. at PageID 1363-64, 1385-86, 1470-71.)

      There is also evidence in the record that, after the terminations, the Memphis Store's

organizing efforts were chilled.  The six-person organizing committee was reduced to one.  A

current barista, Ax Heiberg, testified that the terminations caused him not to wear his union pins

anymore because he felt like he would be targeted if he did – he decided "[t]o just keep [his]

head down, focus on work."  (ECF No. 73 at PageID 1568.)  He stated that he "was not positive

for the union" and stopped discussing it with others.  (Id.)  Indeed, after the terminations,

Heiberg would only discuss organizing efforts with other partners if he "knew for a fact that they

were pro-union and that no managers could overhear [him.]"  (Id. at PageID 1569.)  He also

stated that he noticed that, on the morning shifts after the terminations, every partner other than

Hall stopped wearing their union pins at work.  (ECF No. 73 at PageID 1569, 1588.)

At the hearing, Heiberg also spoke of managerial activity that he perceived as targeting

union activity.  On the morning of February 9, 2022, Heiberg and Store Manager Page saw

members of the Memphis Seven picketing outside the Memphis store.  (Id. at PageID 1570.)

Heiberg was told to lock the lobby door, so he went to the door, cracked it to say that he could

not talk to the picketers, shut the door and locked it.  (ECF No. 73 at PageID 1571.)  According

to Heiberg, Store Manager Page then told him he was not allowed to talk to the picketers, and he

responded that he was telling that to the picketers.  They "went back and forth a few times before

[Heiberg] just gave up and walked away."  (Id. at PageID 1572.)  When asked if that

conversation affected his willingness to participate in the picketing in support of the Union

organizing campaign, Heiberg answered "yes."  (Id.)

Heiberg also testified at the hearing that Hall and other partners hired after the

terminations participated in protest activities outside the store.  (Id.)  However, he believed that

he would be unfairly targeted if he were seen protesting, and he communicated those sentiments

to Sanchez, McGlawn, Hardin and Throckmorton between April 24 and 28, 2022.  (Id.)

The record also includes evidence of more enduring chilling effects at the Memphis

Store.  Despite the successful union election at the Memphis Store, there was testimony about

continuing fear of supporting the ongoing bargaining process.  For instance, while Heiberg stated

that the anonymity of voting for the Union using a secret ballot allowed him to participate in

Union elections, he confirmed that he would not want to be part of a bargaining committee

because that type of open union support would position him as a target for Starbucks.  (ECF No. 73 at PageID 1583.)

The evidence indicates that some partners believe that, even with the successful election, an ongoing negotiating process amidst the lingering impacts of the terminations renders participants in the bargaining process still "highly susceptible" to management misconduct. Lund, 794 F. Supp. 2d at 823.  Moreover, while true that discharged partners are involved in the bargaining process already underway, (see Exhibit 56), without employment at the Memphis Store, they are limited in their capacity to communicate with, to influence, and to knowledgeably advocate for fellow union members.  And the organizing activity of Hall, the only remaining member of the organizing committee still employed at Starbucks, narrowed in scope as her recruitment efforts were stymied.  According to Hall, although she spoke with and convinced nine of the ten new hires to support the organizing campaign, she did not speak about the campaign with any of the five employees who transferred to the Memphis Store from Store Manager Page's previous store because she did not feel comfortable trusting them.  (ECF No. 73 at PageID 1490-91.)

Starbucks still argues that, contrary to the Board's position which relies on hearsay evidence, there was no chill from the terminations, and the publicity about the terminations actually galvanized union activity both at the Memphis Store and nationally.  (ECF No. 81 at PageID 1675-76.)  It emphasizes that Hall continued organizing at the Memphis Store, convincing new hires to wear pro-union pins at work, and that she testified about other partners' interest in joining the organizing committee.  (Id. at PageID 1676 (citing ECF No. 73 at PageID 1490-91).)  Starbucks also notes that Sanchez testified that his termination strengthened the organizing effort and that the discharged partners have engaged in ongoing union activity.  (Id. at

PageID 1676-78 (citing, inter alia, ECF No. 1-2 at PageID 153).)  Indeed, according to

Starbucks, the terminations actually "emboldened union activities" both in Memphis and

nationally.  (ECF No. 81 at PageID 1681 (citing ECF No. 75 at PageID 1253 (over 300 petitions

were filed for the Union to represent Starbucks workers from mid-December 2021 to the week

before the hearing)).)

 Complicating Starbucks' narrative is contrary testimony about the chilling impact of the

terminations.  (See, e.g., ECF No. 73 at PageID 1600 (Margaret Carter testifying that Jackson

store partners told her they were "very fearful about actions that were similar [to the Memphis

terminations] taking place in their store if they were to organize."); ECF No. 75 at PageID 960-

61 (Richard Bensinger testifying that a partner in Southern Florida told him that he was

"incredibly nervous for himself that he would be fired like the Memphis people were;" that it

was difficult to recruit a committee of union organizers in the store; and that his manager stated

to him, "Let's just not have here what happened in Memphis.").)  Moreover, the Board notes that

affirmative evidence of organizing does not negate other situations where "even the possibility of

organizing has been extinguished or where any perceived momentum for the Union in once-

active campaigns has died."  (ECF No. 84 at PageID 1747.)

 The Court emphasizes that evidence of the movement being chilled or energized on a

national scale does not change the Board's proffered evidence of "some erosion of Union

support" in the Memphis Store.  See Catatrello v. Carriage Inn of Cadiz, No. 2:06-cv-697, 2006

WL 3230778, at *7, *23 (S.D. Ohio Nov. 6, 2006) (finding that one employee's testimony about

concerns about union support constituted "some evidence [of] erosion of Union support" and

was sufficient for the court to find injunctive relief just and proper).  Indeed, the effect of the

actions on the ability of the remaining employees at the Memphis Store to effectively bargain is

critical when considering this requested relief.  See Lightner, 823 F. Supp. at 253 (the Board's remedial power is impacted if the termination chilled "co-employees") (emphasis added); Lund, 794 F. Supp. 2d at 822 (discussing a "heightened" need for interim relief when a newly-certified union has "yet to achieve an initial collective bargaining agreement").

    Here, even if the evidence is not wholly conclusive as to the overall chill, "an adequate foundation has been offered" to warrant this temporary injunctive relief.  See Boren v. Cont'l Linen Servs., Inc., No. 1:10–cv–562, 2010 WL 2901872, at *5 (W.D. Mich. July 23, 2010) (conclusive proof not required under just-and-proper standard for the issuance of an injunction). Instead of waiting until the Board's final order, which could come at a time when the discharged employees have found other work and the reinstatement order would be an "empty formality," the reinstatement of the Memphis Seven "will nearly as is now possible restore the conditions prevailing before the discharges and so prevent a frustration of the ultimate administrative action."  See Angle v. Sacks, 382 F.2d 655, 660-61 (10th Cir. 1967).  Under § 7 of the Act, employees have the decision "to bargain collectively through representatives of their own choosing" – and may make that choice "without restraint or coercion by their employer."  29 U.S.C. § 157; NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 33 (1937).  Granting temporary injunctive relief will enable the Board to determine the merits of these alleged acts without frustration of the "policy of the United States" to "encourag[e] . . . collective bargaining."  29 U.S.C. § 151.  It will not "advance the Union's cause" as Starbucks puts it, (ECF No. 85 at PageID 1760), but rather restore the employees' ability to effectively bargain in the ongoing process.[10]

_____

[10] Starbucks supplemented the record from the hearing with an email sent from Kylie Throckmorton to Starbucks management on June 14, 2022, requesting a meeting to negotiate the first bargaining contract.  (Exhibit 56.)  However, the record does not contain any further

Finally, that the reinstatement of the Memphis Seven may require dismissal of a replacement does not support denying injunctive relief.  "[A]ny hardship that may be caused by the displacement of new employees is outweighed by the harm that will result if the union's organizational efforts are terminated prematurely." Blyer ex rel. NLRB v. P & W Elec., Inc., 141 F. Supp. 2d 326, 331 (E.D.N.Y. 2001).

### B.  Other Injunctive Relief

The Board also requests other relief, including (1) a broad cease-and-desist order; (2) interim rescission of the discipline issued to Taylor; (3) a reading of the Court's Order in front of employees and a representative of the Board; (4) posting of the Order at the Memphis Store; (5) distribution of electronic copies of the Order to all Starbucks employees via the Partner Hub; and (6) distribution, via Partner Hub, of electronic copies of a Starbucks official or Board agent reading the Order in the presence of the other person.

A cease and desist order has been found as "just and proper" relief under § 10(j) of the Act where "there is reasonable cause to believe that the effects of unfair practices linger." Gottfried for & on Behalf of NLRB v. Purity Sys., Inc., 707 F. Supp. 296, 302 (W.D. Mich. 1988 (citing Eisenberg v. Wellington Hall Nursing Home, 651 F.2d 902, 904 (3d Cir. 1981)).  Here, in light of the Board's evidence suggesting the existence of multiple unlawful employment practices, ordering Starbucks to cease and desist those practices "is in the public interest to effectuate the policies of the NLRA and to protect the NLRB's remedial powers." See Hooks ex rel. NLRB v. Ozburn-Hessey Logistics, LLC, 775 F. Supp. 2d 1029, 1051–52 (W.D. Tenn. 2011).  Achieving the status quo in the relationship between Starbucks and the partners involved

---

indication that the bargaining process has yet been successful or that a meeting took place, despite Throckmorton's proposal of a meeting on July 11, 2022.  (See id.)

here is possible by directing Starbucks to cease unlawful behaviors.  If the activity was instead allowed to continue until the conclusion of the Board's administrative proceedings, there is a "reasonable apprehension that the efficacy of the NLRB's final order may be nullified and the administrative procedures . . . rendered meaningless."  See id. at 1051.

Additionally, the rescission of any discipline issued to Taylor is "just and proper" to protect the remedial power of the Board.  If the discipline, which the Board has established reasonable cause to believe was unlawfully issued, were to remain in Taylor's file, it may allow Starbucks' unlawful activity to continue with impunity.  However, the Court orders the rescission solely of the discipline which was actually issued to Taylor.  To the extent that Taylor was not issued discipline for a dress code violation, as Starbucks' evidence suggests, the lack of issued discipline does not need a remedy.

As for the reading, distribution, and posting of the Court's Order, the Court finds it "just and proper" to affirmatively require Starbucks to post copies of the Order in the Memphis Store "because it officially notifies Respondent's employees of the Court's order."  Muffley v. APL Logistics Mgmt. Warehouse Servs., Inc., No. 3:08-CV-26-R, 2008 WL 4561573, at *2 (W.D. Ky. Oct. 10, 2008) (citing Gottfried v. Mayco Plastics, Inc., 472 F. Supp. 1161, 1166 (E.D. Mich. 1979), aff'd 615 F.2d 1360 (6th Cir. 1980)).  However, the Court does not find it "just and proper" to require Starbucks to read the Order aloud, or to post electronic copies of the Order on the Partner Hub or via any other intranet site.  Restoring the Memphis Store to the status quo, which is the focus of this Order, does not require broader dissemination.

## <u>CONCLUSION</u>

As explained above, the Petition for Temporary Injunctive Relief is **GRANTED IN PART**.  **IT IS THEREFORE ORDERED THAT:**

A.  Respondent, its officers, representatives, supervisors, agents, employees, attorneys, and all persons acting on its behalf or in participation with it, are hereby enjoined, pending the final disposition of the matters involved herein by the Board, from:

    1.  Discharging, disciplining or otherwise discriminating against employees because of their activities on behalf of and support for the Union or any other labor organization;

    2.  More closely supervising or monitoring the activities of employees because of their activities on behalf of and support for the Union or any other labor organization;

    3.  Preventing employees from engaging in protected activity by closing the lobby/café portion of its facility and confiscating and removing union and pro-union materials from the community bulletin board; and

    4.  In any other manner interfering with, restraining, or coercing its employees in the exercise of the rights guaranteed them in § 7 of the Act.

B.  Respondent, its officers, agents and representatives shall:

    1.  Within five (5) days of the issuance of this Order, offer, in writing, full interim reinstatement to employees Florentino Escobar, Nabretta Hardin, LaKota McGlawn, Luis "Beto" Sanchez, Cara Nicole Taylor, Kylie Throckmorton and Emma Worrell or, if those positions no longer exist, to substantially equivalent positions at the Memphis Store without prejudice to their seniority or any other rights and privileges previously enjoyed, and displacing, if necessary, any employee who may have been hired, contracted for, or reassigned to replace them;

    2.  Within five (5) days of the issuance of this Order, rescind and expunge the unlawful discipline issued to Cara Nicole Taylor and refrain from relying on that discipline in issuing any future discipline;

    3.  Within seven (7) days of the issuance of this Order, post copies of the Court's Order at Starbucks' Memphis Store in all places where Starbucks typically posts

notices to its employees at the Memphis Store, as well as translations in other languages as necessary to ensure effective communication to Starbucks' employees as determined by the Board's Regional Director of Region 15, said translations to be provided by Starbucks at its expense; maintain these postings during the pendency of the Board's administrative proceedings free from all obstructions and defacements; grant all employees free and unrestricted access to said postings; and grant to agents of the Board reasonable access to its worksite to monitor compliance with this posting requirement;

C.  Within twenty (20) days of the issuance of this Order, file with the Court, with a copy submitted to the Regional Director of Region 15 of the Board, a sworn affidavit from a responsible official of Starbucks describing with specificity the manner in which Respondent has complied with the terms of this Court's Order, including how the documents have been posted as required by the Court.

**IT IS SO ORDERED**, this 18th day of August, 2022.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE