# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TENNESSEE
# WESTERN DIVISION

| | |
|---|---|
| M. KATHLEEN McKINNEY, Regional Director of Region 15 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD,<br><br>    Petitioner,<br>v.<br><br>STARBUCKS CORPORATION,<br><br>    Respondent. | No. 2:22-cv-2292-SHL-cgc |

## ORDER DENYING RESPONDENT'S EMERGENCY MOTION TO STAY PENDING APPEAL

Before the Court is Respondent's Emergency Motion to Stay Pending Appeal or In the Alternative Extend the Deadline for Compliance, filed August 21, 2022. (ECF No. 88.) Respondent seeks a stay of the Court's Order Granting in Part Petition for Temporary Injunction, issued August 18, 2022, (ECF No. 86), pending their appeal to the Sixth Circuit Court of Appeals. Based on the analysis below, the Court **DENIES** the Motion to Stay, and thus the Order remains in effect, subject to any contrary orders by the Sixth Circuit.[1]

---

[1] On August 23, 2022, the deadline for Starbucks to convey its written offer of reinstatement to the seven terminated employees, this Court held a virtual hearing to discuss the status of this Motion to Stay and the logistics at issue with the offer and onboarding for the seven individuals. Because the Court intended to fully address this Motion on an expedited basis, and given the amount of lead time between the written offer and when the employees would actually be back at work, the Court did not stay the reinstatement offer process pending consideration of this Motion to Stay. However, later that same day, the Court of Appeals did grant a stay pending a ruling on this Motion by this Court.

I. **Procedural Background**

On May 10, 2022, M. Kathleen McKinney, Regional Director of Region 15 of the National Labor Relations Board, filed a petition on behalf of the Board requesting injunctive relief under § 10(j) of the National Labor Relations Act ("NLRA"). (ECF No. 1.) The Petition sought injunctive relief pending the administrative disposition by the Board of various unlawful labor practice charges filed by the Board against Respondent. (Id.) Petitioner was permitted to supplement the record with additional affidavits, (ECF Nos. 51-2, 51-3, 51-4), and the Court permitted Workers United ("the Union") to participate as amicus curiae, (ECF No. 45). Respondent filed a Pre-Hearing Memorandum on June 3, 2022. (ECF No. 61.)

The Court held a hearing on the Petition on June 9 and 10, 2022, and denied Respondent's Oral Motion for Judgment on Partial Findings. (ECF Nos. 70 & 71.) The Parties filed post-hearing briefs, (ECF Nos. 81 & 82), and responses to opposing briefs, (ECF Nos. 84 & 85).

On August 18, 2022, the Court issued its Order Granting in Part Petitioner's Request for a Temporary Injunction. (ECF No. 86.) Respondent filed its Emergency Motion to Stay the Injunction Pending Appeal on August 21, 2022, (ECF No. 88), and both Petitioner and the Union filed Responses in Opposition on August 23, 2022, (ECF Nos. 89 & 91).

II. **Analysis**

Federal Rule of Appellate Procedure 8(a) and Federal Rule of Civil Procedure 62(d) allow a district court to stay an injunction while an opposing party appeals its issuance. When considering whether to grant a party's request for a stay, courts in this circuit consider the same four factors as those considered for issuing preliminary injunctions: (1) the likelihood that the movant will prevail on the merits of the appeal; (2) the likelihood that the movant will be

irreparably harmed absent a stay; (3) the prospect that others will be harmed if the stay is granted; and (4) the public interest in granting the requested stay. Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog, 945 F.2d 150, 153 (6th Cir. 1991). The movant must show a likelihood of reversal on appeal. Id. The level of likelihood the movant must show is negatively related to the amount of irreparable harm that the movant shows they may incur absent a stay; as the amount of irreparable harm increases, the required showing of likelihood of success falls, and vice versa. Id. The Court will evaluate each factor in turn.

### A. Likelihood of Success on the Merits

To satisfy their burden on this factor, Respondent must show, "at a minimum, serious questions going to the merits." Dodds v. U.S. Dep't of Educ., 845 F.3d 217, 221 (6th Cir. 2016) (quoting Mich. Coal., 945 F.2d at 153). In making this assessment, the Court bears in mind that which Respondent seems to have forgotten – § 10(j) petitions are unique, requiring courts to assess the evidence to determine, in general, whether it meets a particular standard but not to make credibility decisions between competing evidence. See Muffley ex rel. NLRB v. Voith Indus. Servs., Inc., 551 F. App'x 825, 830 (6th Cir. 2014) ("[T]he district court is not to resolve conflicting evidence or weigh credibility in a § 10(j) proceeding"). With this fundamental principle in mind, the specifics of Respondent's five discrete arguments are analyzed below. (See ECF No. 88-1 at PageID 1821-25.)

#### 1. Taylor's Disciplinary Actions

Respondent's first argument centers on the two disciplinary actions involving Taylor. Respondent claims that this Court failed to hold Petitioner to its required evidentiary bar by permitting Petitioner to assert, without evidence, that Starbucks issued Taylor two disciplinary actions. (ECF No. 88-1 at PageID 1821-22.) Respondent argues that this Court erred by relying

3

solely on Taylor's testimony without giving any weight to Morton's contradictory testimony that no disciplinary actions were ever given. (Id.) Finally, Respondent argues that this Court further erred by relying on purely circumstantial evidence that Morton had knowledge of organizing activity at the Memphis Store by January 14, 2022, the day the alleged discipline was issued. (Id.)

The evidence offered at the hearing and the Court's Order contradict Respondent's arguments. First, Respondent's assertion that Petitioner failed to show that Taylor was issued a disciplinary action is contradicted by the evidence. Beyond simply Taylor's testimony concerning the disciplinary actions and the physical forms entered into evidence, both which contain Morton's signature, (see Exhibits 1 & 2), Morton himself testified that "I am the one that ultimately delivered [the disciplinary action] to [Taylor]." (ECF No. 75 at PageID 1161.) Moreover, Respondent conceded in previous briefing that Morton indeed issued at least one disciplinary action to Taylor. (ECF No. 81 at PageID 1691-92.)

Second, Respondent fails to consider the standard under which the Court must evaluate Petitioner's evidence. When reviewing a § 10(j) petition, the Court is not permitted to resolve conflicting evidence as Respondent argues the Court should. Muffley, 551 F. App'x at 830. Respondent offers no argument as to why this Court should disregard this binding precedent.

Third, the Court considered Respondent's argument concerning the circumstantial support for Morton's knowledge of union organizing efforts at the time of Taylor's disciplinary actions. (See ECF No. 86 at PageID 1790-91.) However, given the evidentiary burden here and the fact that the Court cannot weigh conflicting testimony, the Court concluded that the Board presented sufficient evidence to meet its burden on this issue.

2. Comparator Evidence and Pretext

Respondent's second argument involves evidence of comparators. Respondent argues that this Court erred when it disregarded evidence that Respondent relied on comparator evidence prior to the terminations. (ECF No. 88-1 at PageID 1823.) Respondent points to Steve Fox's testimony that he looked at similar circumstances of partner misconduct. (Id.) Respondent further argues that this Court misapplied the Wright Line test by evaluating comparator evidence in the context of particular partners rather than in the context of pretext. (Id. at 1822-23.)

Respondent relies on Fox's testimony in support of its argument that Respondent did in fact consider comparator evidence prior to terminating the Memphis Seven. It was Morton, however, who ultimately made the decision to terminate the seven partners. (ECF No. 75 at PageID 1139) (Q: "Who made the decision to discharge these individuals? A: "Ultimately I did;" Testimony of Cedric Morton.) And nothing in Morton's testimony indicated that he in any way considered comparators prior to terminating the partners. Morton does mention that "several partner relations support partners," including Fox, participated in arriving at the decision. (Id. at 1140.) But the only mention of Fox's role in Morton's decision involved reviewing video footage of the incidents to identify participants in the alleged violations of company policy. (Id. at 1170.) Morton never stated that he relied on comparators.

However, even if Morton had said that he relied on Fox's comparator evidence, Respondent's contention that the Court misapplied the use of comparator evidence in the Wright Line test would still be incorrect. As the Court noted in its Order, the Board proffered evidence consistent with its legal theory that Respondent's policy justifications (including comparator evidence) were pretextual in part specifically because Respondent had tolerated similar conduct

5

at the Memphis Store prior to the terminations for the same conduct.  (ECF No. 86 at PageID 1801-02.)  Thus, the Board's evidence directly contradicts Respondent's assertion that "Starbucks acted in accordance with its own past practice."  (ECF No. 88-1 at PageID 1823.)  Again, this Court is not permitted to resolve conflicting evidence and simply considers whether the Board's evidence is consistent with its substantial legal theory.  Muffley, 551 F. App'x at 830.  Here, it was.

In Respondent's final argument regarding the Court's finding of pretext, it takes issue with the Court's assertion in its Order that "there is no evidence in the record to support the existence of any safety concerns that night," (ECF No. 86 at PageID 1801-02), arguing that this statement is unsupported by the record and that other objective evidence supports a finding that there were indeed safety concerns at the Memphis Store.  (ECF No. 88-1 at PageID 1823.)  What Respondent misses, however, is that this evidence was considered in the context of pretext, not as an objective factual finding on safety.  The Board proffered evidence that partners were previously permitted to unlock the store after hours to allow individuals into the store and were neither reprimanded nor terminated for doing so.  (ECF No. 73 at PageID 1424.)  Respondent then proceeded to terminate several partners for violating this same, previously inconsistently enforced, policy.  This evidence is indeed consistent with the Board's substantial legal theory, the standard to be used in § 10(j) proceedings.

       3. <u>Insufficient Evidence of a Chilling Effect at the Memphis Store</u>

Respondent next argues that the Court's finding that an injunction would be "just and proper" is insufficiently supported by evidence.  Specifically, Respondent argues that this Court placed undeserved weight on Ax Heiberg's testimony regarding his experience at the Memphis Store following the terminations.  (ECF No. 88-1 at 1823-24.)  It contends that Heiberg's

testimony counts as nothing more than subjective, hearsay evidence that is countered by objective evidence of continued union support in the Memphis Store, evidenced primarily by the successful union vote. (Id.)

A district court's determination of whether issuance of a temporary injunction under § 10(j) would be "just and proper" is reviewed by an appellate court under an "abuse of discretion" standard. Schaub v. W. Mich. Plumbing & Heating, Inc., 250 F.3d 962, 970 (6th Cir. 2001). A district court abuses its discretion only when it "relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." Kobell v. United Paperworkers Int'l Union, 965 F.2d 1401, 1410 (6th Cir. 1992) (quoting Fleischut v. Nixon Detroit Diesel, 859 F.2d 26, 30 (6th Cir. 1988)).

The Court first notes that Respondent challenges neither the Court's application nor standard of the law regarding "just and proper" determinations. Thus, it appears that Respondent contends that this Court relied upon clearly erroneous findings of fact in determining that Respondent's actions resulted in a chilling effect at the Memphis Store.

In reaching its decision on "chilling effect," the Court did rely, in part, on Heiberg's testimony. He testified at length about his own experiences in the Memphis Store and his opinions about the effect of the terminations, stating that he stopped wearing his union pin for fear of retaliation, that he stopped discussing unionization with others unless he knew he could trust them, and that every partner other than Hall had stopped wearing union pins to work. (See ECF No. 73 at Page ID 1568-69, 1588.) Contrary to Respondent's contention, Heiberg's testimony encompassing his perception of the Memphis Store and its workplace environment, what occurred following the terminations, and his own actions is not hearsay testimony. While

7

such testimony is subjective, that label does not negate its relevance on the issue of "chilling effect." Indeed, "chilling effect" must, at some level, be a subjective determination.

Additionally, however, the Court also relied on "objective" evidence in determining that an injunction would be just and proper, describing how the union's organizing committee was reduced by 80 percent with the terminations. (ECF No. 86 at PageID 1805.) The Court noted specifically how this objective factor, when an organizing committee is decimated in this manner, renders the remaining employees currently in the process of bargaining a contract with Respondent highly susceptible to management misconduct. (Id. at 1807.) Moreover, the "important role [a terminated employee] played in developing union support" is a factor that the Court may consider in its just and proper analysis for reinstatement. Gottfried v. Frankel, 818 F.2d 485, 496 (6th Cir. 1987). The Court did so when it considered evidence of Taylor's outsized role in organizing the union at the Memphis Store and the extent to which her termination would chill unionization efforts. (ECF No. 86 at PageID 1805.) The Court therefore did not solely rely on subjective, hearsay evidence in its just and proper analysis as Respondent suggests.[2]

The thrust of Respondent's argument on this point seems to be that the Court improperly weighed the evidence in its just and proper analysis by relying too heavily on Heiberg's testimony while not relying enough on "objective" evidence countering it. But that is not the legal standard for success on appeal on this element which requires a clearly erroneous finding of fact. Because Respondent has failed to allege any clearly erroneous finding of fact, alleging instead an improper balancing of facts, this argument is unlikely to carry the day on appeal.

---

[2] In any event, Respondent cites no authority that would suggest that the Court must draw a distinction between subjective or objective evidence in a just and proper determination and then weigh the two, and the Court thus declines to do so.

4. <u>Infeasible Return to the Status Quo</u>

Respondent next argues that this Court made no explicit determination that a return to the status quo prior to the allegedly unlawful labor practices is possible and that intervening circumstances, particularly the successful union certification vote, have rendered a return to the status quo through reinstatement impossible anyways. (ECF No. 88-1 at PageID 1824.)

A temporary injunction under § 10(j) of the NLRA is just and proper when it is "necessary to return the parties to the status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA, and whether achieving status quo is possible." <u>McKinney v. Ozburn-Hessey Logistics, LLC</u>, 875 F.3d 333, 339 (6th Cir. 2017). The status quo is "that which existed before the alleged unfair labor practices took place." <u>Muffley</u>, 551 F. App'x at 834.

Respondent characterizes the status quo as "when there was open Union support in the store, but there had not been an election." (ECF No. 88-1 at PageID 1824.) Thus, as Respondent's logic goes, now that there has been a successful union vote, there is no way to restore the status quo, short of somehow decertifying the vote. (<u>Id</u>.)

The Court disagrees with Respondent's characterization. The substantial legal theory, as put forward by the Board in its Petition, is that the allegedly unlawful terminations of the Memphis Seven caused a chilling effect on open union support in the Memphis Store. The status quo is therefore when the Memphis Seven were employed at the Memphis Store and the chilling effect had yet to occur.

The Court credited Heiberg's testimony in support of the Board's theory of a chilling effect on organization efforts at the Memphis Store. (<u>See</u> ECF No. 86 at PageID 1805-07.) Following the terminations, but prior to the vote, Heiberg testified that he and all but one other

partner at the Memphis Store ceased wearing union pins to work (on the day immediately following the terminations) and that he would no longer discuss unionization while on the job. (Id. at 1805-06.) Heiberg also testified that he only felt comfortable voting to support the Union because a secret ballot was used. (Id. at 1806.) This is evidence, consistent with the Board's legal theory, that a chilling effect occurred following the terminations but prior to the vote.

Heiberg's testimony continued however. Heiberg further testified that, following the successful vote, he would not want to be part of the bargaining committee because such open support of the Union would make him a target for Respondent, as the Memphis Seven had been. (Id. at 1806-07.) This indicates, as the Board argues, that a persistent chilling effect remains at the Memphis Store following the successful unionization vote. Moreover, the Court recognized that the discharge of the Memphis Seven, while some remain a part of the bargaining process, "limited [] their capacity to communicate with, to influence, and to knowledgeably advocate for fellow union members." (Id. at 1807.) This is further evidence of an enduring chill on union efforts, even following the successful vote.

Given the above evidence, the Court found, contrary to Respondent's assertion that it made no determination, that the status quo prior to the chilling effect could be achieved through reinstatement of the Memphis Seven. The Court held that a sufficient foundation had been offered to show an overall chill on union support in the Memphis Store and that reinstatement of the Memphis Seven "will nearly as is now possible restore the conditions prevailing before the discharges and so prevent a frustration of the ultimate administrative action." (Id. at PageID 1809 (quoting Angle v. Sacks, 382 F.2d 655, 660-61 (10th Cir. 1967).)

Respondent briefly asserts that relying on the chilling effect on the bargaining process at the Memphis Store is inappropriate given the Board's initial reliance on a chilling effect on

overall union support in its Petition. (ECF No. 88-1 at PageID 1824 n.3.) However, the Board's substantial legal theory has been consistent: the terminations of the Memphis Seven led to a chilling effect on unionization efforts at the Memphis Store. The evidence above, showing a chilling effect both prior and subsequent to the successful union vote, is consistent with this legal theory which is all that the Board is required to show for a temporary injunction under § 10(j). Muffley, 551 F. App'x at 827.

### 5. Extraordinary Nature of the Relief

Respondent's final argument states that this Court failed to explicitly consider the "extraordinary nature of Section 10(j) relief" and did "not explain why this relief is necessary in this instance to protect the Board's remedial powers under the NLRA." (ECF No. 88-1 at PageID 1825.)

The Court, however, did precisely that. In its Order, the Court held that the Board had proffered evidence sufficient to constitute an adequate foundation that there was a chilling effect caused by the allegedly unlawful terminations. (ECF No. 86 at PageID 1809.) The Court then held that reinstatement of the Memphis Seven would allow the Board to administratively adjudicate the allegedly unfair labor practices without frustration of the policy of the United States to encourage collective bargaining. (Id. (citations omitted).) As the Court explained, without reinstatement, the chilling effect on the Union's bargaining process would continue until the Board's ultimate disposition of the case. (Id.) By the time of this disposition, the Court held that reinstatement could be rendered an empty formality as the Memphis Seven may have long since found other work. (Id.) Together, these holdings address the very thing Respondent argues the Court did not consider: whether without injunctive relief the Board would be unable to adequately remedy the harm resulting from the alleged unfair labor practices.

### B. Likelihood of Irreparable Harm

Respondent argues that it will suffer significant, irreparable harm should this Court fail to stay its Order. (ECF No. 88-1 at 1826-29.) Respondent points to incalculable monetary damages it will incur by employing allegedly hostile former employees along with additional monetary damages from onboarding the reinstated employees and the disruption in staffing they would cause. (Id. at 1826-28.) Respondent further points to nonmonetary damages it would incur through a loss of customer goodwill as current partners at the Memphis Store will be displaced, disrupting relationships the current partners have cultivated with the Store's customers. (Id. at 1829.)

"Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" to constitute irreparable harm. Baker v. Adams County/Ohio Valley Sch. Bd., 310 F.3d 927, 930 (6th Cir. 2002). Monetary loss may sometimes, however, constitute irreparable harm if "the nature of the loss would make the damages difficult to calculate." Certified Restoration Dry Cleaning v. Tenke, 511 F.3d 535, 550 (6th Cir. 2007) (quoting Basicomputer Corp. v. Scott, 973 F.2d 507, 511 (6th Cir. 1992)).

The Court agrees with Petitioner and amicus – Respondent's harm is monetary in nature and readily measurable, and thus not irreparable. Contrary to Respondent's assertion, Respondent should be able to quantify the cost of onboarding seven, veteran employees as well as the costs of accommodating them at the Memphis Store. While the Memphis Store may indeed experience a disruption, quantifiable potentially by a reduction in revenue at the Store, the cost to displace seven current partners, either through relocation or termination, is a similarly ascertainable amount, particularly given Respondent's size and ample resources.

Respondent's sole allegation of nonmonetary damages is that the loss of current partners at the Memphis Store will disrupt customer relations those partners have built and that a disruption in staff will harm customer goodwill. (ECF No. 88-1 at PageID 1829.) The Court disagrees. In Certified Restoration Dry Cleaning, 511 F.3d at 538, the case on which Respondent relies, the customer relationships that formed the basis for the customer goodwill involved franchise dry cleaners contracting with insurance companies and restoration contractors, both of whom relied on past experiences with the cleaners to justify future, repeated business once the cleaners had proven themselves. Here, however, the contact between partners at the Memphis Store and customers is far less extensive and far less pivotal for a customer's repeated patronage at the Memphis Store. The Court thinks it profoundly unlikely that the absence of a customer's preferred barista at their local Starbucks location will in any way affect their choice to continue patronizing said Starbucks.

### C. Potential Harm to Others

Respondent states that neither the Memphis Seven nor the Union will be harmed by a stay of the Order. (ECF No. 88-1 at PageID 1829-30.) Indeed, Respondent argues that there is a significant risk that the Memphis Seven will be harmed absent a stay as success on appeal for the Respondent would lead to their termination by Respondent again, resulting in another Starbucks job loss. (Id.) Respondent also argues that any risk to the Union is low given the lengthy process of first-contract bargaining and the brief nature of the stay pending appeal. (Id. at 1830.) Finally, Respondent notes that, absent a stay, current partners may be displaced as a result of the Memphis Seven's reinstatement. (Id.)

First, the Court agrees with Petitioner and amicus insofar as it will be up to the Memphis Seven to accept Respondent's offers of reinstatement, in full knowledge of the risk that a

13

pending appeal presents. The Order does not require that they accept the offers, merely that the offers be made. Therefore, there is no substantial risk of harm in requiring that the Order remain in effect and the offers be made.

Second, the continuing harm to the Union is not low as Respondent argues. The Court found the evidence of the chilling effect on the Union's bargaining process sufficient to support reinstatement of the Memphis Seven. (ECF No. 86 at PageID 1809.) This chill continues so long as the Memphis Seven are not reinstated as the bargaining process continues irrespective of the proceedings in court.

Finally, Respondent notes that it may be forced to relocate, terminate, or reduce the hours of current partners to accommodate the reinstated partners. (ECF No. 88-1 at Page ID 1830.) However, the Court has already found that the harm that may be suffered by these current partners is outweighed by the harm resulting from failure to reinstate the Memphis Seven. (ECF No. 86 at PageID 1810) (quoting Blyer ex rel. NLRB v. P & W Elec., Inc., 141 F. Supp. 2d 326, 331 (E.D.N.Y. 2001).)

### D. Public Interest in Granting a Stay

Respondent argues that the Board's delay in filing its Petition for Injunctive Relief undermines the need for the immediate implementation of the Order and that a brief stay would not be against the public interest. (ECF No. 88-1 at PageID 1830-31.)

When the Government is the opposing party to a Motion to Stay, the "harm to the opposing party and the public interest factors" merge. Wilson v. Williams, 961 F.3d 829, 845 (6th Cir. 2020) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

The Court held that the Board has an interest in enforcing the policy of the United States to encourage collective bargaining and that reinstatement of the Memphis Seven is necessary to

protect the Board's remedial powers regarding such interest. (See ECF No. 86 at PageID 1809.) Each additional day the Order fails to be enforced necessarily impairs the Board's remedial powers constituting cognizable harm to the Board. Given that the Board's harm is also the public's harm, a stay would be against the public interest; the Board's litigation timeline under these circumstances is irrelevant.

## CONCLUSION

Much of Respondent's Motion asks the Court to do that which it cannot do at this stage: weigh evidence, make credibility determinations, and resolve conflicts in the record. Precedent in this circuit precludes the Court from undergoing its analysis of the evidence in the ways Respondent requests.

Respondent similarly neglects to consider that Petitioner's evidentiary burden is relatively insubstantial to establish reasonable cause for a § 10(j) temporary injunction and that the Court must consider only whether the facts of the case are consistent with Petitioner's legal theory (Respondent does not challenge whether the theory is substantial). As the Court discussed at length in its Order, the facts are so consistent.

Finally, Respondent did not address in its Motion that the Court's determination of whether the issuance of a temporary injunction would be "just and proper" is reviewed under an abuse of discretion standard. Respondent did not challenge the legal standard the Court applied nor the application of said standard. Respondent argued that the Court improperly weighed the evidence rather than that the Court made a clearly erroneous finding of fact, which is insufficient for success on appeal under an abuse of discretion standard.

For the reasons described above, Respondent's Emergency Motion to Stay Pending Appeal is **DENIED**. Additionally, Respondent cites no authority that would require this Court to

extend the Order's deadlines by 14 days and the Court declines to do so. All deadlines in the Order therefore remain the same, subject to contrary orders by the Sixth Circuit Court of Appeals.

**IT IS SO ORDERED**, this 26th day of August, 2022.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
UNITED STATES DISTRICT JUDGE
