RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

M. KATHLEEN MCKINNEY, Regional Director of
Region 15 of the National Labor Relations Board, for
and on behalf of the National Labor Relations Board,

*Petitioner-Appellee,*

*v.*

STARBUCKS CORPORATION,

*Respondent-Appellant.*

No. 22-5730

---

Appeal from the United States District Court for the Western District of Tennessee at Memphis.
No. 2:22-cv-02292—Sheryl H. Lipman, District Judge.

Argued: May 4, 2023

Decided and Filed: August 8, 2023

Before: SUTTON, Chief Judge; BOGGS and READLER, Circuit Judges.

---

### COUNSEL

**ARGUED:** Arthur T. Carter, LITTLER MENDELSON, P.C., Dallas, Texas, for Appellant.
Laurie Monahan Duggan, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for
Appellee. **ON BRIEF:** Arthur T. Carter, LITTLER MENDELSON, P.C., Dallas, Texas, A.
John Harper III, LITTLER MENDELSON, P.C., Houston, Texas, for Appellant. Laurie
Monahan Duggan, Richard J. Lussier, Laura T. Vazquez, NATIONAL LABOR RELATIONS
BOARD, Washington, D.C., for Appellee. Michael Schoenfeld, STANFORD FAGAN LLC,
Atlanta, Georgia, Mary Joyce Carlson, WORKERS UNITED, Washington, D.C., Ryan E.
Griffin, Daniel M. Rosenthal, Michael P. Ellement, JAMES & HOFFMAN PC, Washington,
D.C., for Amicus Curiae.

BOGGS, J., delivered the opinion of the court in which SUTTON, C.J. and READLER,
J., joined. READLER, J. (pp. 14–28), delivered a separate concurring opinion.

---

## OPINION

---

BOGGS, Circuit Judge.  Following news coverage of a unionization effort at one of its stores in Memphis ("Memphis Store"), Starbucks fired seven partners[1] who worked there ("Memphis Seven").  Workers United ("Union") filed an action with the National Labor Relations Board ("Board"), charging that Starbucks's firing of the Memphis Seven, and other anti-union actions, violated section 8 of the National Labor Relations Act ("Act").  Meanwhile, M. Kathleen McKinney, a regional director of the Board, petitioned the district court for temporary injunctive relief pending completion of the Board's proceedings.  The district court found reasonable cause to believe that Starbucks had violated the Act.  It also concluded that, because of the chilling impact of the terminations on Union support, some of the requested interim relief, including temporary reinstatement of the Memphis Seven, was just and proper. For the following reasons, we affirm.

## I. BACKGROUND

### A.    Facts

#### 1.  *Early Organizing Efforts*

In early January 2022, Nikki Taylor, a shift supervisor at the Memphis Store, reached out to partners at a Starbucks in Buffalo, New York, to discuss their union-organizing efforts.  The Buffalo partners directed her to the Union.  After speaking with Union representatives, Taylor shared her interest in unionizing the Memphis Store with coworkers, including Makayla Abrams, Reaghan Hall, Nabretta Hardin, Beto Sanchez, and Kylie Throckmorton.  These conversations took place at work, where managers could overhear them.  Managers interjected, at least twice, to ask what the conversations were about.

---

[1]Starbucks refers to its employees as "partners." STARBUCKS, *Careers: Culture and Values*, https://www.starbucks.com/careers/working-at-starbucks/culture-and-values/.

On January 14, District Manager Cedric Morton issued Taylor two corrective-action forms without warning. The first corrective-action form stated that Taylor had engaged in aggressive, insubordinate behavior towards a store manager on December 29, 2021, and January 12, 2022. Taylor denied doing so. The second corrective-action form recorded a clothing violation—wearing leggings to work—which Taylor also denied. A store manager, Elizabeth Page, had told Taylor that "in practice, [managers] would have a conversation with a partner" before disciplining them. Taylor also testified that other Starbucks employees were not issued corrective-action forms for failing to comply with Starbucks's dress code.

Taylor continued her organizing efforts and, on January 17, facilitated a Zoom meeting between coworkers interested in forming a union-organizing committee—Hall, Hardin, Lakota McGlawn, Sanchez, Taylor, and Throckmorton—and Union representatives. During the meeting, the partners drafted a letter to Starbucks's then-CEO Kevin Johnson, announcing their intent to unionize.

### 2. The Media Event

On January 18, the letter to CEO Johnson was posted on social media. Hardin distributed union-authorization cards to coworkers. Although the store's schedule showed a full staff, Morton and Page decided to close the store early. Around 6 p.m., a news crew arrived at the Memphis Store, and Taylor opened the door for the crew to enter. Taylor, who was off duty at the time, did not have permission to invite the crew inside, but no partner expressed concern about the media's presence. The crew interviewed Florentino Escobar, Hardin, McGlawn, Sanchez, Taylor, and Throckmorton about their reasons for organizing and what they hoped to achieve and left the store around 6:20 p.m.

Before leaving, Hardin, Sanchez, Taylor, and Throckmorton went behind the counter. Sanchez opened the store's safe for McGlawn, the designated cash controller, because McGlawn lacked a personal access code. The partners testified that there was nothing unusual about their actions that night. They regularly came to the store—even while off duty—to check the work schedule or retrieve their personal belongings, went behind the counter after work to make a free

drink (a perk of the job), and helped partners who were responsible for accessing the safe, but who had not received a personal code to do so.

### 3. *Starbucks's Initial Response*

Store management learned of the media event the next day, and Starbucks launched an investigation. Meanwhile, the Union and the Memphis Store organizing committee scheduled a sit-in campaign for January 21 to 23. Following this announcement, Morton, who had only periodically visited the Memphis Store, began to visit almost daily. Morton announced that the lobby would be closed and that the store would operate as a drive-thru-only location from January 20 to 23, because of short-staffing. The lobby remained closed on those days, despite the store being fully staffed. On January 22, Hall and Sanchez attempted to reopen the lobby. Morton arrived and was confused as to why the lobby had been reopened, as he "was under the assumption that it was supposed to stay closed no matter what." Only on January 24, when the store was actually short-staffed, did it return to normal operations.

According to Hall, managers also began to remove pro-union material pinned to the store's community bulletin board. Hall reported that managers eventually removed all material from the bulletin board and repositioned a condiment bar to make the board less noticeable. Sanchez testified that Morton told him that such material violated company policy.

### 4. *Termination of the Memphis Seven*

On February 8, Starbucks fired five of the six organizing-committee members—Hardin, McGlawn, Sanchez, Taylor, and Throckmorton—and two other partners who had engaged in pro-union activity—Escobar and Emma Worrell. Starbucks claimed that it fired these employees for violating company policy during the January 18 media event, including by: (1) being in the store while off duty; (2) entering the back-of-house or counter area while off duty; (3) unlocking a locked door to allow an unauthorized person to enter while off duty; (4) activating the safe and handling cash while off duty; and (5) supervising while these offenses were being committed. Two partners who were present during the January 18 media event, Aiden Harris and Kimora Harris, were not fired: Kimora had not committed any apparent violations and Aiden's violation––failing to ring up a beverage—was not deemed a terminable offense.

Acknowledging that their actions violated company policy, Taylor and Hall testified that management rarely, if ever, enforced these violations. Sanchez also testified that, in the past, Page had directed him to share his personal safe-access code with other partners, so that they could open the safe and handle cash.

### 5. *Effect of the Terminations*

After the firings, only one organizing-committee member still worked at the Memphis Store. The store operated only as a drive-thru over the next couple of weeks. Even with the lobby closed, Morton, Page, and managers from other Starbucks locations came to the store every day. The visiting managers did not explain why they were suddenly stationed there. And they remained there after the store reopened the lobby.

On the morning shift, every partner other than Hall stopped wearing union pins to work. Ax Heiberg, a barista, testified that the firings caused him to stop wearing union pins because he felt that demonstrating open union support would make him a target. He eventually stopped discussing union matters with other partners unless he knew that they were pro-union and knew that no managers were around. Hall also testified that she did not feel comfortable discussing the organizing campaign with partners transferred from Page's previous store.

A senior Union organizer and a Union representative (who worked at a different Starbucks) both testified that the Memphis firings spread anxiety and fear among partners who were considering unionizing at other Starbucks locations. For example, partners at a store in Jackson, Tennessee, told one organizer that they were hesitant to unionize after what happened to the Memphis Seven, noting that Starbucks had posted a notice in the store detailing the discharges. A partner at a Starbucks in Florida said that his manager suggested that unionization would lead to a response from Starbucks similar to the one in Memphis.

On June 7, in an anonymous election, Memphis Store partners voted eleven-to-three in favor of joining the Union. The discharged partners remained involved in the bargaining process after the vote.

## B.    Procedural History

Between February and April 2022, the Union filed charges with the Board, alleging that Starbucks had engaged in unfair labor practices, in violation of section 8(a)(1) and (3) of the Act. Following an investigation, the General Counsel of the Board issued a consolidated complaint and notice of hearing against Starbucks for alleged violations of the Act.   On May 10, 2022, McKinney, a regional director of the Board, petitioned the district court, pursuant to section 10(j) of the Act, for injunctive relief pending resolution of the Board's administrative proceedings. McKinney sought a cease-and-desist order and various forms of affirmative relief, including the interim reinstatement of the Memphis Seven.

The district court granted in part McKinney's petition for a temporary injunction and ordered Starbucks to reinstate the discharged partners.   The court held that the Board had established "reasonable cause" to believe that Starbucks had committed each of the five unfair labor practices alleged by the Board.   The court also found that injunctive relief, including reinstatement of the Memphis Seven, was "just and proper."   In addition to reinstatement, it ordered Starbucks to: (1) rescind and expunge any unlawful discipline issued to Taylor; (2) post, and ensure access to, copies of the district court's order in the Memphis Store; and (3) confirm compliance with the court's order.   Such relief, the court found, was necessary to restore the status quo that existed before the alleged violations, so as to preserve the remedial power of the Board pending resolution of its administrative proceedings.

Starbucks filed an emergency motion to stay the district court's order pending appeal. The district court denied Starbucks's emergency motion.  The company then sought a stay of the order from a panel of this court, which the panel denied. *McKinney v. Starbucks Corp.*, No. 22-5730 (6th Cir. Sept. 6, 2022) (per curiam).

Starbucks timely appealed the district court's order granting injunctive relief, which we now review on the merits.[2]

---

[2]On the same day that the parties presented oral argument, an administrative law judge (ALJ) issued a decision in the underlying administrative case. Starbucks Corp., Nos. 15-CA-290336 et al., (N.L.R.B May 4, 2023). Parties may file exceptions to the ALJ's decision with the Board within 28 days. Here, the Board granted the parties an extended deadline, June 30, 2023, to file exceptions.  Starbucks Corp., Nos. 15-CA-290336 et al., (N.L.R.B. May

## II. ANALYSIS

### A.   Legal Framework

The Act provides that "[e]mployees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining." 29 U.S.C. § 157.  The Act further states that:

> It shall be an unfair labor practice for an employer–
>
> (1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
>
> ...
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization.

*Id.* § 158(a).  To preserve the Board's ultimate remedial powers while administrative proceedings are pending, the Act enables the Board to "petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred . . . for appropriate temporary relief." *Id.* § 160(j).

This court applies a two-factor test to determine whether such relief is warranted. *See Ahearn ex rel. NLRB v. Jackson Hosp. Corp.*, 351 F.3d 226, 236 (6th Cir. 2003) (noting that some circuits use the four-factor framework that is generally used for preliminary injunctions).  To obtain temporary relief, the Board must establish that (1) there is "reasonable cause to believe that unfair labor practices have occurred" and (2) injunctive relief is "just and proper." *Ozburn-Hessey*, 875 F.3d at 339 (first quoting *Ahearn*, 351 F.3d at 234; and then quoting *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001)).  Relief "is just and proper where it is 'necessary to return the parties to status quo pending the Board's proceedings in order to protect the Board's remedial powers under the NLRA.'" *Ibid.* (quoting *Gottfried v. Frankel*, 818 F.2d 485, 495 (6th Cir. 1987)).  The district court must then determine "whether achieving

_____

19, 2023).  The ALJ's decision does not mark the end of the Board's proceedings, and we are not compelled to defer to it. *McKinney v. Ozburn-Hessey Logistics (Ozburn-Hessey), LLC*, 875 F.3d 333, 339–40 (6th Cir. 2017).

[the] status quo is possible." *Ibid.* (quoting *Gottfried*, 818 F.2d at 495). "[T]he status quo is the state of affairs existing before the alleged unfair labor practices took place." *Schaub*, 250 F.3d at 972 (quoting *Frye ex rel. NLRB v. Specialty Envelope Inc.*, 10 F.3d 1221, 1226 (6th Cir. 1993)).

In reviewing the supporting facts, a district court may not resolve conflicting evidence or make credibility determinations. *Muffley ex rel. NLRB v. Voith Indus. Servs., Inc.* 551 F. App'x 825, 830 (6th Cir. 2014); *see Ahearn*, 351 F.3d at 237 ("[F]act-finding is inappropriate in the context of a district court's consideration of a 10(j) petition."). We review a district court's just-and-proper finding for abuse of discretion and reverse only where the court "relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Kobell ex rel. NLRB v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1410 (6th Cir. 1992) (quoting *Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 30 (6th Cir. 1988)).

**B.      Just-and-Proper Analysis**

Notably, Starbucks does not challenge the district court's holding that there is reasonable cause to believe that Starbucks violated the Act in terminating the Memphis Seven. We thus consider only whether interim relief was just and proper and conclude that the district court did not abuse its discretion in ordering interim restatement, among other related relief, to preserve the status quo pending completion of the Board's proceedings.

Consider the context. In early January 2022, Taylor contacted Union representatives and discussed the prospect of unionizing the Memphis Store with fellow partners. Morton then issued Taylor two debatable corrective-action forms without warning—an irregular procedure. On January 17, a seven-partner organizing committee posted a letter indicating its intent to unionize the Memphis Store. After the media covered the story, Starbucks alleged that seven partners had violated company policy and fired them. But, as the record indicates, violations such as these were rarely, if ever, punished. On occasion, management appears to have even encouraged them. The next week, when committee members scheduled a sit-in campaign to garner union support, management closed the Memphis Store lobby under the pretense of being short-staffed.

Under these circumstances, Starbucks's termination of the Memphis Seven—including six of the seven members of the organizing committee[3]—mere weeks after the media event would almost certainly chill other partners' exercise of rights protected by the Act. *See Ahearn*, 351 F.3d at 239 (upholding reinstatement as just and proper because of the "inherently chilling effect" of the firing of employees directly after they had engaged in a union strike); *see also Frankl v. HTH Corp.*, 650 F.3d 1334, 1363 (9th Cir. 2011) ("[T]he discharge of active and open union supporters risks a serious adverse impact on employee interest in unionization and can create irreparable harm to the collective bargaining process." (quoting *Pye v. Excel Case Ready*, 238 F.3d 69, 74 (1st Cir. 2001))). The district court did not err in concluding that the termination of 80% of the organization committee during a unionization campaign could lead to injury to the union movement that subsequent Board intervention would not be able to remedy.

And, as the district court noted, the record contains actual evidence of chill. After the firings, Heiberg stopped wearing a union pin for fear of being targeted. He was not alone: other than Hall, every partner on his shift stopped wearing a pin. Heiberg also feared that he would be targeted by management if he were to express open support for the protests or other union activities. He refrained from discussing pro-union sentiments with anyone unless he "knew for a fact that they were pro-union and that no managers could overhear [him.]" Hall similarly felt uncomfortable discussing organizing efforts with employees transferred from Page's previous location. Other evidence in the record indicated that the terminations chilled unionization efforts in Tennessee and Florida. Starbucks argues that the district court abused its discretion in ordering reinstatement because the Union's election victory indicates that any chilling effect had abated. As the district court explained, a successful union election does not preclude the continuance of a chilling impact on employees' willingness to exercise other rights safeguarded by the Act. Union elections are conducted anonymously, allowing employees to participate without fear of retaliation. Conversely, collective bargaining requires a demonstration of open support, which employees such as Heiberg might well not engage in for fear of reprisal.

---

[3]Hall, the only member of the original organizing committee who was not terminated, was not at the store on January 18.

Starbucks fails to cite any authority suggesting that a successful union election precludes injunctive relief. And it might seem odd that only successful attempts at intimidation warrant relief, even though the unjustly fired employees are still out of luck if their fellows win a secret-ballot election. Our precedent indicates that a district court may consider prospective harm to other rights protected under the Act, including collective bargaining, in ordering temporary injunctive relief. In *Ahearn*, a hospital fired six employees soon after they had participated in a strike organized by their union. 351 F.3d at 230–33. Several non-discharged employees testified that the firings had "a chilling effect on union activity, inasmuch as the employees stopped wearing union buttons, spoke in hushed tones about union activities, and feared reprisal." *Id.* at 239. The district court ordered reinstatement, finding that such injunctive relief was necessary because the employer's anti-union animus, followed by actual firings, "was inherently chilling" and testimony from non-discharged employees suggested that the firings produced an actual chilling effect on union support. *Id.* at 233–34, 240. In affirming, this court noted that the "the Union was quite new and had not even signed its first contract, 'making bargaining units highly susceptible to management misconduct.'" *Ibid.* (quoting *Arlook ex rel. NLRB v. S. Lichtenberg & Co.*, 952 F.2d 367, 373–74 (11th Cir. 1992)).

Here, as in *Ahearn*, the new Union faces a critical juncture. Fear of retaliation will exist unless the Memphis Seven, apparently terminated for their union support, are reinstated. Likewise, the organizing committee faced a severe encumbrance on its ability to unionize effectively when all but one of its number were terminated. And while the Memphis Store voted to unionize after the firings, a failure to reinstate the Memphis Seven (who now lead the bargaining committee) would similarly undermine the Union's bargaining strength as it seeks its first collective-bargaining agreement. *See ibid.*; *see also Ozburn-Hessey*, 875 F.3d at 341 (affirming the district court's ordered temporary relief as "necessary" because a failure to do so "might undermine the Union's strength on the eve of its first collective bargaining opportunity"); *Pascarell v. Vibra Screw*, 904 F.2d 874, 880 (3d Cir. 1990) (finding that termination of the entire bargaining committee rendered the chilling effect on other employees "patent").

As the district court pointed out, reinstatement is further supported by the fact that without employment at the Memphis Store, the discharged members of the bargaining committee

are limited in their capacity to communicate with and advocate for their fellow Union members. Although Memphis Store partners have since voted to unionize, sufficient evidence of inherent and actual chill supports the district court's holding that the ordered temporary relief is necessary to preserve the status quo pending resolution of the Board's proceedings.

**C.    Starbucks's Remaining Arguments**

Starbucks presents other challenges to the ordered relief, none of which is availing.

*Whether a Return to the Status Quo Is Possible.* Starbucks argues that the district court abused its discretion in ordering reinstatement because the election irrevocably altered the legal bargaining status of the parties, making a return to the status quo "impossible." In doing so, Starbucks offers an overly narrow view of what makes a return to the status quo possible. Starbucks's reading of the Act would allow employers who violate labor laws to have their cake and eat it too: they could either engage in misconduct and successfully discourage unionization or engage in misconduct and fail to prevent unionization, secure in the knowledge that an election victory would absolve them of their sins. It would also place undue weight on the outcome of an anonymous election in determining whether workers can freely exercise their rights under the Act.

Once this court has decided that a return to the status quo is necessary, the appropriate question becomes whether a return to the status quo is, in fact, possible. *See Gottfried*, 818 F.2d at 495–96. This is not a metaphysical inquiry. Rather, we have asked: are the employees "still able . . . to return to their old jobs[?]" *Ozburn-Hessey*, 875 F.3d at 341. If the Memphis Store closed, for example, a return to the status quo would be impossible. As it has not, the reinstatement of the Memphis Seven remains possible and, as discussed above, is necessary to restore the status quo that existed prior to Starbucks's alleged misconduct—that is, a work environment where employees can express union support without fear of retaliation.

*Unclean Hands.* Starbucks also argues that the district court failed to consider that the Union was primarily responsible for any chill. Particularly, Starbucks claims that the Union "publicized the separations and created a narrative that they were retaliatory." The company points to an Eleventh Circuit case, *Arlook*, 952 F.2d 367, to support the notion that a court may

deny section 10(j) injunctive relief "on the basis of inappropriate union conduct (such as spreading rumors or sensationalizing wholly unsubstantiated charges against a company)."

*Arlook* does not help Starbucks. There, the Eleventh Circuit reversed a district court's denial of temporary injunctive relief. *Arlook*, 952 F.2d at 375. It held that the lower court had clearly erred in finding "that the Union was as responsible for the 'chilling' of organizational activities as the Company." *Id.* at 374. "To justify the denial of . . . equitable relief on the basis of inappropriate union conduct (such as spreading rumors or sensationalizing wholly unsubstantiated charges against a company)," the court said, "the conduct must be documented in the record." *Ibid.* And the record lacked any such evidence. *Ibid.*

Here, too, there is no evidence in the record to suggest that the Union "spread[] rumors or sensationalized wholly unsubstantiated charges against" Starbucks. *Arlook*, 952 F.2d at 374. Starbucks does not identify any rumors or unsubstantiated charges made by the Union. Nor, as noted above, does it contest the district court's reasonable-cause findings. Rather, Starbucks merely points out that the Union publicized the actual facts of the termination of the Memphis Seven and, on that basis, faults the Union as primarily responsible for a chill that, Starbucks claims, no longer exists. But Starbucks fails to identify any authority suggesting that a union that informs its members of anti-union activities should be precluded from obtaining temporary injunctive relief. And Starbucks's crude attempt at scorekeeping fails to explain how its own publication of the terminations immediately after the event (and again two weeks later) to partners at the Memphis Store and nationwide should not be counted against it. Starbucks's unclean-hands challenge fails.

*Proper Standard for Section 10(j) Relief.* Finally, relying on *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008), Starbucks argues that the district court should have applied the traditional four-factor test for preliminary injunctions rather than the two-factor reasonable-cause/just-and-proper test it applied in ordering injunctive relief here. *Winter*, however, did not involve a section 10(j) injunction; it merely restated the traditional four-factor test's applicability to preliminary injunctions in general. *Id.* at 20. We, however, have consistently applied the two-factor test for section 10(j) injunctions. *See Ahearn*, 351 F.3d at 234–35 (noting that a number of "other circuits have retained the [two-factor] standard").

And we have continued to do so post-*Winter. See Ozburn-Hessey*, 875 F.3d at 343. Absent an intervening en banc or Supreme Court decision, we may not overrule the decision of a prior panel. *See Ahearn*, 351 F.3d at 234–36 (citing *United States v. Moody*, 206 F.3d 609, 615 (6th Cir. 2000)).

*Remaining Injunctive Relief.* Starbucks stakes its challenge to the remainder of the order on the success of its challenge to the reinstatement. Because the district court did not abuse its discretion in ordering reinstatement, and Starbucks presents no independent argument contesting the remainder of the order, we affirm the order in its entirety.

### III. CONCLUSION

The record contains sufficient evidence to support the district court's order of temporary injunctive relief as necessary to return the parties to the status quo pending resolution of the Board's proceedings. We **AFFIRM** the judgment of the district court.

---

## CONCURRENCE

---

CHAD A. READLER, Circuit Judge, concurring.  When a party seeks a preliminary injunction, we apply a familiar test.  Four factors in all, the key ingredients include the moving party's likelihood of success and the threat of irreparable injury.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008).  Together, these considerations—both legal and equitable—channel our discretion to issue injunctive relief.  *See Salazar v. Buono*, 559 U.S. 700, 714 (2010) ("An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief.").

Why, then, do we deviate from this trusted practice when the National Labor Relations Board invokes § 10(j) of the Taft-Hartley Act to preliminarily enjoin a company's alleged unfair labor practices during the pendency of Board proceedings?  As far as I can tell, there is no particularly good answer.  In § 10(j) proceedings, we apply a test borrowed long ago from other circuits.  When we adopted that approach, we failed to explain why we cast aside the traditional, demanding, four-factor test in favor of a meek two-part version.  And we conspicuously failed to deploy the textualist principles that govern today's means of statutory review.  That decision, in short, was suspect from the start.

Nor has it aged gracefully.  The standard we apply for § 10(j) proceedings is in tension with intervening Supreme Court precedent.  *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982).  And it is directly contrary to the developing trend in our sister circuits.  *See Muffley ex rel. NLRB v. Spartan Mining Co.*, 570 F.3d 534, 542–43 (4th Cir. 2009); *Sharp v. Parents in Cmty. Action*, 172 F.3d 1034, 1038–39 (8th Cir. 1999); *Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*, 19 F.3d 449, 456–60 (9th Cir. 1994) (en banc), *abrogated on other grounds by Winter*, 555 U.S. at 7; *Kinney v. Pioneer Press*, 881 F.2d 485, 490–91 (7th Cir. 1989).  Not only that, but our test also produces uneven results, tilting the field in the Board's favor.  Until this misguided approach is corrected, however, we are left to follow our prior decisions.  As the majority opinion faithfully does so, I reluctantly concur in that decision.

A. Is there a more identifiable four-part test than the one federal courts apply when assessing whether preliminary injunctive relief is warranted?  Litigators can no doubt recite the formula from memory: (1) the movant's likelihood of success on the merits; (2) the extent of irreparable harm to the movant; (3) the balance of the equities; and (4) the public interest. *Winter*, 555 U.S. at 20; *see also Kentucky v. Biden*, 57 F.4th 545, 550 (6th Cir. 2023); *Sisters for Life, Inc. v. Louisville-Jefferson County*, 56 F.4th 400, 403 (6th Cir. 2022); *Doster v. Kendall*, 54 F.4th 398, 410 (6th Cir. 2022).  Adherence to this legal quartet harmonizes our approach to preliminary relief, ensuring we exercise our authority "consistent with traditional principles of equity." *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 394 (2006).  Over and over, the Supreme Court has emphasized that each of the four benchmarks deserves consideration before relief may be granted. *Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) (per curiam) (affirming the denial of a preliminary injunction on the last two factors); *Glossip v. Gross*, 576 U.S. 863, 876 (2015) ("[T]his case turns on whether petitioners are able to establish a likelihood of success on the merits."); *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (emphasizing the importance of irreparable injury).  It likewise has reminded us that a preliminary injunction is "extraordinary" and "never awarded as of right." *Winter*, 555 U.S. at 24.  Consistent with these admonitions, federal courts apply the four *Winter* factors in the early stages of a wide range of constitutional and statutory disputes. *See, e.g.*, *Ramirez v. Collier*, 142 S. Ct. 1264, 1275 (2022) (Religious Land Use and Institutionalized Persons Act); *Trump v. Hawaii*, 138 S. Ct. 2392, 2403, 2423 (2018) (Establishment Clause); *Winter*, 555 U.S. at 19 n.4, 20 (National Environmental Policy Act); *eBay*, 547 U.S. at 391 (Patent Act); *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 534, 544 (1987) (Alaska National Interest Lands Conservation Act); *Romero-Barcelo*, 456 U.S. at 306, 320 (Federal Water Pollution Control Act); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 685, 689–90 (6th Cir. 2014) (First Amendment).

1. Yet in assessing whether it is necessary to allow the Board to direct a business's operations through a § 10(j) injunction, our Court long ago jettisoned the *Winter* standard in favor of a less rigorous one.  That decision has serious ramifications for private employers and unions alike, and thus deserves a second look.

Begin with some observations on the current state of play. The Board's § 10(j) activity is on the rise. In the first 15 years of § 10(j)'s life, it was deployed on average "only three times per year." Bruce W. Burns, *Section 10(j) of the National Labor Relations Act: A Legislative, Administrative and Judicial Look at a Potentially Effective (But Seldom Used) Remedy*, 18 Santa Clara L. Rev. 1021, 1022 (1978) (footnote omitted). Times, it seems, have changed. The Board now puts § 10(j) to work more than six times as often as it did before. Nat'l Labor Rels. Bd., Performance and Accountability Report FY 2022, at 86 (publication date unknown); *see also* Memorandum from Jennifer A. Abruzzo, NLRB General Counsel to Regional Directors, Officers-in-Charge, and Resident Officers 1–3 (Feb. 1, 2022).

Now consider a reality of NLRB unfair labor practice investigations: they do not happen overnight. Complaints often take a year for the Board to resolve, and months more to bring the matter to completion. Performance and Accountability Report FY 2022, at 149 (showing FY 2021 averages of 286 days between issuance of a complaint and an administrative law judge's decision, 305 days between the issuance of that decision and the Board's order, and 869 days between the issuance of a Board order and the case's closing); *see also Lineback ex rel. NLRB v. Irving Ready-Mix, Inc.*, 653 F.3d 566, 570 (7th Cir. 2011) (noting the "'glacial' pace of Board proceedings") (quotation omitted)); *Cal. Pac. Med. Ctr.*, 19 F.3d at 453 ("The Board took nearly 28 months to resolve [the] unfair labor practice charge[.]"). This case is no exception. The Board issued its operative complaint on July 8, 2022. An administrative law judge rendered a decision 10 months later. The parties were then afforded nearly two months to file exceptions to the order. 29 C.F.R. § 102.46(a). Eventually, the Board itself will review Starbucks's case, *id.* § 102.48(b), at which point federal court litigation will likely ensue. *See generally UAW of Am., Loc. 600 v. NLRB*, 956 F.3d 345 (6th Cir. 2020) (appeal of Board petition to enforce order).

2. As this lengthy process unfolds, should the Board be able to constrain the employer's operations? Congress has answered that question, at least in part. Section 10(j) of the Taft-Hartley Act of 1947 authorizes the Board to seek preliminary injunctive relief. 29 U.S.C. § 160(j) ("The Board shall have power . . . to petition . . . for appropriate temporary relief or restraining order. . . ."); *McKinney v. Ozburn-Hessey Logistics, LLC*, 875 F.3d 333, 339 (6th Cir.

2017). That command begs the question: what framework should courts use to assess the Board's request?

Turn to the statutory text. Congress gave district courts considering § 10(j) petitions a short instruction: enter "such temporary relief . . . as it deems just and proper." 29 U.S.C. § 160(j). Ordinarily, one would read the broad command "just and proper" as invoking the discretion we traditionally exercise when faced with requests for equitable relief. *See Spartan Mining Co.*, 570 F.3d at 542 ("'[J]ust and proper' is another way of saying 'appropriate' or 'equitable.'" (citation omitted)); *Pioneer Press*, 881 F.2d at 491 ("Section 10(j) tells the district court to do what's 'just and proper[,]' which we read as a statement that traditional rules govern—the approach emphasizing the public interest applied when the government is the plaintiff."). Dictionary definitions confirm that instinct. The term "just" (both then and now) is a synonym for "equitable." *Just* (adj.), Webster's New International Dictionary (2d ed. 1949); *Just* (adj.), Oxford English Dictionary (Rev. 2013) (entry I.5.b.); *accord Cal. Pac. Med. Ctr.*, 19 F.3d at 458. To the same end, "proper" means "appropriate," "suitable," or "correct." *Proper* (adj.), Funk & Wagnalls New Standard Dictionary (1943 ed.); *Proper* (adj.), Oxford English Dictionary (Rev. 2007) (entry I.1.).

In practice, crafting "appropriate" or "suitable" equitable relief necessitates an exercise of discretion. Samuel L. Bray & Paul B. Miller, *Getting Into Equity*, 97 Notre Dame L. Rev. 1763, 1794 (2022) ("Judges in equity have discretion in determining whether, as a matter of substantive doctrine, petitioners have 'an equity' that warrants intervention . . . as well as in selecting and tailoring remedies[.]"). Discretion, in turn, is a hallmark of equity. *Romero-Barcelo*, 456 U.S. at 312 ("The essence of equity jurisdiction has been the power of the Chancellor to do equity and to mould each decree to the necessities of the particular case." (quoting *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944))). Employing that discretion, courts "traditionally [have] had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distrib. Co.*, 166 F.3d 840, 846 (6th Cir. 1999). Putting "just" and "proper" together, then, leads us to the same conclusion the esteemed Judge Friendly reached years ago: the NLRA incorporated traditional equitable principles. *Danielson v. Joint Bd. of Coat, Suit & Allied Garment Workers' Union*, 494 F.2d

1230, 1241–42 (2d Cir. 1974); *see also Cal. Pac. Med. Ctr.*, 19 F.3d at 458 (favorably citing the same decision).

So one would expect us to honor that "traditional equitable authority" when the Board seeks an injunction pursuant to § 10(j) of the Taft-Hartley Act. *See Miller v. French*, 530 U.S. 327, 340 (2000). "We presume that statutes conform to longstanding remedial principles." *Arizona v. Biden*, 40 F.4th 375, 396–97 (6th Cir. 2022) (Sutton, C.J., concurring). Absent the "clearest" congressional instruction or an "inescapable inference" that we should depart from those traditional equitable factors, we must apply them. *Miller*, 530 U.S. at 340 (citations omitted); *compare United States v. Miami Univ.*, 294 F.3d 797, 817 (6th Cir. 2002) ("Given the assortment of remedies available in the [statute], Congress by no means foreclosed the exercise of equitable discretion."), *with United States v. Szoka*, 260 F.3d 516, 523, 524 (6th Cir. 2001) (reading a statute's command that the court "shall enforce obedience to such order by a writ of injunction" to curtail discretion).

*Weinberger v. Romero-Barcelo* exemplifies the point. 456 U.S. at 305. There, a district court found that the Navy violated a statutory scheme prohibiting permitless discharge of certain pollutants. *Id.* at 307–08. The plaintiff asked the court to enter a preliminary injunction barring the Navy from further violations. The court declined to do so based on its weighing of traditional equitable factors. *Id.* at 309–10. On appeal, the First Circuit vacated the district court's order, believing that the Navy's violation of a "statutory obligation" entitled the challengers to an injunction. *Id.* at 310–11. That approach, the Supreme Court later held, was contrary to the inherited, robust tradition, spanning "several hundred years," of judicial discretion over the propriety of injunctive relief. *Id.* at 313 (quotation omitted). The "comprehensiveness of this equitable jurisdiction," we were reminded, "is not to be denied or limited in the absence of a clear and valid legislative command." *Id.* (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)). And because the statute at issue lacked a clear command curtailing that discretion, whether injunctive relief was appropriate turned on an assessment of the "great principles of equity." *Porter*, 328 U.S. at 398 (approving the district court's exercise of equitable discretion) (citation omitted).

Requests for injunctive relief under the Taft-Hartley Act should follow suit. Section 10(j) authorizes a district court to grant injunctive relief when it is "just and proper" to do so. This is "a limited exception to the federal policy against labor injunctions . . . reserved for 'serious and extraordinary' cases." *Parents in Cmty. Action*, 172 F.3d at 1037 (quotation omitted). As the statute gives no indication that the traditional equitable factors governing an injunction ought to be disregarded, we must apply them in § 10(j) proceedings. I am not alone in that view. In the wake of *Romero-Barcelo*, at least four other circuits have said the same. *See Spartan Mining Co.*, 570 F.3d at 542; *Parents in Cmty. Action*, 172 F.3d at 1038 ("[T]he reference to 'just and proper' in § 10(j) incorporates traditional equitable principles."); *Cal. Pac. Med. Ctr.*, 19 F.3d at 456 (same); *Pioneer Press*, 881 F.2d at 490–91 (Easterbrook, J.) (noting that "[d]eviations from [the] traditional equitable balancing exist, but are rare," and holding that "just and proper" incorporates the four traditional *Winter* factors (citing *Romero-Barcelo*)). The Fourth Circuit perhaps put it best. "In light of *Romero-Barcelo*, . . . in determining if a § 10(j) injunction should issue, the traditional four-part equitable test should govern what relief is 'just and proper.'" *Spartan Mining Co.*, 570 F.3d at 542. That being the case, our Circuit too should honor *Romero-Barcelo* by applying the traditional four *Winter* criteria in § 10(j) proceedings.

B. And yet we do not. We instead followed a winding path through the decisions of a handful of other circuits. What we found was a weak, two-part test: (1) reasonable cause and (2) just and proper relief, defined as only some notion of future harm. To see why, turn back the clock nearly 45 years to *Levine v. C & W Mining Co.*, one of our early cases addressing § 10(j). 610 F.2d 432, 435 (6th Cir. 1979). Things started off on the right note. To determine what standard the Board must meet to justify an injunction, we turned to § 10(j)'s text, specifically the "just and proper" requirement. *Id.* In analyzing those terms, however, we left our interpretive tools in the toolbox. More persuasive, it seems, was a "rumor chain" of rulings by other circuits. *Pioneer Press*, 881 F.2d at 492. At the time, we observed, other appeals courts had "consistently" held that the Board need only demonstrate "reasonable cause" to believe an unfair labor practice had occurred for a § 10(j) injunction to issue. *C & W Mining Co.*, 610 F.2d at 435 (citing decisions of the Second, Fifth, Eighth, and Tenth Circuits). Where, you might ask, did these courts discover that standard? Not in the text of § 10(j), which makes no "reference to 'reasonable cause.'" *Spartan Mining Co.*, 570 F.3d at 542. Rather, that benchmark was

Case 2:22-cv-02292-SHL-cgc Document 107-1 Filed 08/08/23 Page 20 of 28 PageID 1961

(22 of 31)

No. 22-5730                McKinney v. Starbucks Corp.                Page 20

imported from a neighboring statutory section that *mandates*, not merely permits (as does § 10(j)), that the Board seek an injunction in certain circumstances. *See* 29 U.S.C. § 160(*l*) ("If, after [its initial] investigation [of certain unfair labor practices], the [Board] has reasonable cause to believe . . . that a complaint should issue, [it] *shall* . . . petition . . . for appropriate injunctive relief[.]" (emphasis added)); *see also Cal. Pac. Med. Ctr.*, 19 F.3d at 456–57 (describing the differences between §§ 10(j) and (*l*)); *Pioneer Press*, 881 F.2d at 489 (same); Note, *Temporary Injunctions Under Section 10(j) of the Taft-Hartley Act*, 44 N.Y.U. L. Rev. 181, 187–89 (1969) (same). An unusual approach, to be sure. After all, we presume Congress makes an intentional decision "when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Sec. v. MacLean*, 574 U.S. 383, 391 (2015) (citing *Russello v. United States*, 464 U.S. 16, 23 (1983)). Yet by judicial fiat, we overrode Congress's choice to differentiate between §§ 10(j) and (*l*). No rationale for this approach was offered, other than the observation that reasonable cause was "an implicit prerequisite for relief." *See Angle v. Sacks ex rel. NLRB*, 382 F.2d 655, 658 (10th Cir. 1967); *McLeod ex rel. NLRB v. Compressed Air Workers, Loc. No. 147*, 292 F.2d 358, 359 (2d Cir. 1961) (similar). And with that, we entrenched "reasonable cause"—rather than the more demanding "likelihood of success" standard—as the one the Board must meet to secure an injunction.

Having adopted the "reasonable cause" standard, we next needed to define it. Again, we peered over the horizon. What we discovered was the supposition in other circuits that reasonable cause places a "relatively insubstantial" burden on the Board. *C & W Mining Co.*, 610 F.2d at 435 (citing *Hirsch v. Bldg. & Constr. Trades Council*, 530 F.2d 298, 302 (3d Cir. 1976)). That "insubstantial" obligation soon became a fixture in our case law. *E.g., Fleischut v. Nixon Detroit Diesel, Inc.*, 859 F.2d 26, 29 (6th Cir. 1988); *Kobell ex rel. NLRB v. United Paperworkers Int'l Union*, 965 F.2d 1401, 1406 (6th Cir. 1992); *Schaub v. W. Mich. Plumbing & Heating, Inc.*, 250 F.3d 962, 969 (6th Cir. 2001); *Muffley ex rel. NLRB v. Voith Indus. Servs., Inc.*, 551 F. App'x 825, 830 (6th Cir. 2014). As advertised, the burden is not a heavy one. On the law, "the [Board] need not convince the court of the validity of the Board's theory of liability, as long as the theory is substantial and not frivolous." *Gottfried ex rel. NLRB v. Frankel*, 818 F.2d 485, 493 (6th Cir. 1987) (citing other circuits). Absent legal frivolity on the Board's part, in other words, it will satisfy the reasonable cause requirement. And on the facts,

the Board must show merely that "facts exist which *could* support" its theory of liability. *Ozburn-Hessey Logistics*, 875 F.3d at 339 (emphasis added) (quotation omitted).

That leaves the second inquiry in our two-part test: is injunctive relief "just and proper?" Repeating our atextual ways, we departed from the straightforward meaning of that statutory phrase. *Frankel*, 818 F.2d at 494; *Sheeran ex rel. NLRB v. Am. Com. Lines, Inc.*, 683 F.2d 970, 979 (6th Cir. 1982) (quoting *Angle*, 382 F.2d at 660). Traditionally, a movant who has demonstrated a likelihood of success on its claim must also show that it would be irreparably injured without an injunction (as well as why the equities and public interest favor relief). *Winter*, 555 U.S. at 20; *see also Cal. Pac. Med. Ctr.*, 19 F.3d at 456. But for the Board, we had other ideas. Influential was the Tenth Circuit's holding that the "just and proper" inquiry amounted to asking only whether the "efficacy of the Board's final order" could be "nullified" without preliminary judicial intervention. *Am. Com. Lines*, 683 F.2d at 979 (quoting *Angle*, 382 F.2d at 660). That line of reasoning too had suspicious origins—it was the product of divining the law's purpose from its legislative history, a now disfavored method of interpretation. *Angle*, 382 F.2d at 660; *see also Kobell ex rel. NLRB v. Suburban Lines, Inc.*, 731 F.2d 1076, 1090 (3d Cir. 1984) (analyzing "just and proper" as "an instance where courts do better not so much to focus upon the particular words of the governing statute, but upon the general communication the law-making bodies were attempting to send to the courts and the public in passing the relevant act"). Regrettably, we followed this misguided lead. *Am. Com. Lines, Inc.*, 683 F.2d at 979. Over time, we have whittled down the "just and proper" criterion to mean that the mere potential for future impairment of the Board's remedial power is enough to justify injunctive relief. *E.g.*, *Nixon Detroit Diesel*, 859 F.2d at 30 (allowing 10(j) injunctions when "the enforcement of a Board order after the Board's normal processes" may be "ineffective to undo the effects of unfair labor practices").

Where does that leave things? Step one of our § 10(j) test requires a meager showing of "reasonable cause." Step two is no more demanding. It compels only a possibility of future harm to the Board's remedial power. Some 20 years after adopting these benchmarks, and in the aftermath of *Romero-Barcelo*, we expressly declined an invitation to replace them with the traditional four-part test from *Winter*. *Ahearn ex rel. NLRB v. Jackson Hosp. Corp.*, 351 F.3d

226, 234–35 (6th Cir. 2003).  As far as I can tell, *Ahearn* turned more on the volume of our
earlier decisions than it did their veracity.  That is, the number of cases we had decided since
*Romero-Barcelo* coupled with the sheer passage of time seemingly was enough to justify our
continued adherence to the two-part test.  *Id.*  And so we have marched on, dutifully applying
that precedent.  *E.g.*, Maj. Op.; *Ozburn-Hessey Logistics*, 875 F.3d at 339; *Voith Indus. Servs.,
Inc.*, 551 F. App'x at 830, 833; *Glasser ex rel. NLRB v. ADT Sec. Servs., Inc.*, 379 F. App'x 483,
485 (6th Cir. 2010).  Over four decades, we entrenched a body of law far out of line with
traditional equity jurisprudence, an approach others have now jettisoned.  With two decades of
added perspective, our approach to § 10(j) injunctions should be overhauled.

C.1.  Today's case helps demonstrate why.  Had the Board's request for injunctive relief
been evaluated under the *Winter* factors, victory would have been far less certain.  That reality is
evident at every turn, starting with the touchstone for injunctive relief—whether a plaintiff is
"likely" to succeed on its claims.  *Winter*, 555 U.S. at 20.  Not only the first of the four factors,
the likelihood of success often carries the most weight.  *Kentucky*, 57 F.4th at 550.

Applying that guidepost here would have required a thorough probing of the facts as well
as the Board's legal theories.  *McNeilly v. Land*, 684 F.3d 611, 615 (6th Cir. 2012) (requiring
"stringent" proof to make out a likelihood of success in a preliminary posture).  Consider, for
example, the issue of Starbucks's motive.  The Board's theory of anti-union retaliation rested on
the notion that Starbucks was aware of organizing activity when it fired Taylor and when it
closed its store before planned union-related activities.  During the district court proceedings,
however, the store managers denied both allegations.  The Board countered with contrary
testimony.  Were this a traditional equitable inquiry, the district court would have been obligated
to settle these disputes of material fact, at least on a preliminary basis.  *See Certified Restoration
Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 552–53 (6th Cir. 2007) (requiring an
evidentiary hearing on a preliminary injunction motion when material facts are disputed); *Cobell
v. Norton*, 391 F.3d 251, 261–62 (D.C. Cir. 2004) (holding that a district court abuses its
discretion when it fails to hold an evidentiary hearing where credibility determinations are
required).  I cannot say for certain that Starbucks would have prevailed.  But nor, without
factfinding, am I certain that the Board would have triumphed.  Resolving credibility

determinations is the district court's bread and butter. *Eagle Supply & Mfg., LP v. Bechtel Jacobs Co.*, 868 F.3d 423, 430 (6th Cir. 2017) (citing *Anderson v. City of Bessemer*, 470 U.S. 564, 575 (1985)). Yet it was never asked to do so.

That is the case because the factual analysis in § 10(j) proceedings is largely superficial. Employing the reasonable cause standard, the district court contented itself that the Board had shown "sufficient evidence" of unlawful anti-union retaliation. A searching review? Hardly. But a passable one under our imported reasonable cause standard. To clear that hurdle, remember, all the Board had to do was (1) illustrate a non-frivolous legal theory and (2) claim facts consistent with that theory. *Ozburn-Hessey Logistics*, 875 F.3d at 339 (quoting *W. Mich. Plumbing & Heating*, 250 F.3d at 969).

The first prong, in truth, is no real obstacle. By all accounts, it is chiefly concerned with the ability of the Board's attorneys to research labor law and pair it with a complaint. *See id.* at 340 (substantial legal theory existed where the Board correctly identified a statute prohibiting labor discrimination); *Jackson Hosp. Corp.*, 351 F.3d at 238 (same). Assuming a case has been brought in good faith, it is hard to imagine how the Board could not articulate a "substantial legal theory." Proving as much, respondents often decline to challenge the Board's showing, a tack Starbucks took here. Maj. Op. at 8; *see also, e.g., W. Mich. Plumbing & Heating*, 250 F.3d at 969; *Nixon Detroit Diesel*, 859 F.2d at 29–30.

That leaves the second "reasonable cause" prong—claiming facts consistent with the Board's theory. It is no more demanding. In making this assessment, we prohibit the district court from any manner of "fact-finding." That otherwise routine task becomes "inappropriate in the context of a district court's consideration of a 10(j) petition." *Jackson Hosp. Corp.*, 351 F.3d at 237 (citation omitted); *compare id.*, with *Sisters for Life*, 56 F.4th at 403 (noting the standard of review for a district court's factual findings in a preliminary injunction decision). In this way, we have allowed the Board to secure relief by saying little more than "trust me"—a standard that, at its apex, merely resembles our civil pleading requirements. *Compare Ozburn-Hessey Logistics*, 875 F.3d at 339 ("So long as facts exist which could support the Board's theory of liability, the district court's findings cannot be clearly erroneous." (cleaned up)), with *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007))

(accepting plausible factual allegations in complaint as true on a motion to dismiss). Were the § 10(j) "reasonable cause" standard applied in the traditional civil litigation setting, any complaint that could withstand Rule 12(b)(6) would automatically be deserving of injunctive relief as well, rendering the court more a spectator than a referee when it comes to matters of equity.

Of course, § 10(j) proceedings are distinct from traditional civil litigation. And it is not our job to usurp the Board's role as primary enforcer of the NLRA. *Nixon Detroit Diesel*, 859 F.2d at 28–29. But why a preliminary determination of facts on our part would unduly interfere with or influence the Board, let alone bind it, is neither explored nor explained in our cases. *Cf. Robertson v. U.S. Bank, N.A.*, 831 F.3d 757, 761 (6th Cir. 2016) ("[A]ny findings of fact and conclusions of law at [the temporary injunction] stage do not bind the court when it reaches the merits." (citing *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).

In sum, "reasonable cause" at best boils down to a halfhearted version of the traditional likelihood of success test. "[R]elatively insubstantial," we have said. *Ozburn-Hessey Logistics*, 875 F.3d at 339 (quotation omitted). Likewise, it is neither expedient nor likely to produce consistent results. *Pioneer Press*, 881 F.2d at 490–91 (stating that reasonable cause "causes motion but not progress" and observing that "[t]rying to sort cases into bins according to the presence or absence of 'reasonable cause' has produced a complex body of law concerning standards of appellate review" across the circuits). We would be better served by casting it aside, as has the en banc Ninth Circuit and others, in favor of the customary four-factor test. *Cal. Pac. Med. Ctr.*, 19 F.3d at 457; *see also Pioneer Press*, 881 F.2d at 491–93 (departing from a prior interpretation of § 10(j)). Doing so would still respect Congress's decision to imbue the Board with investigative and adjudicative functions. *McKinney ex rel. NLRB v. S. Bakeries, LLC*, 786 F.3d 1119, 1123 (8th Cir. 2015). And it would make the governing standard a contestable one, requiring the district court to assess the likelihood that the Board can actually prevail in the matter. That is not much to ask, given the stakes.

2. Turn next to the nature of the harm the Board needed to establish to justify the issuance of § 10(j) relief. Despite its own enforcement powers, the Board professed to need preliminary relief to ensure at the proceeding's close its ability to remedy the harm caused by

Starbucks's conduct. *See* 29 U.S.C. § 160(a) (describing the Board's enforcement powers).
Applying our "just and proper" jurisprudence, the district court asked only whether any *potential*
injury could be inflicted on the Board's remedial power. *See Jackson Hosp. Corp.*, 351 F.3d at
239. Measuring with that diminutive ruler, the district court found that in the absence of
injunctive relief, the Board might be curtailed in crafting remedies at the case's end.

Those proceedings would have been drastically different had the Board been asked to
satisfy the *Winter* standard. *Winter* famously requires the movant to demonstrate an irreparable
injury, an "indispensable" requirement for injunctive relief to issue. 555 U.S. at 21–22; *D.T. v.
Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019). The genre of irreparable harm at issue
here is harm that the Board, entrusted with its own enforcement powers, would otherwise be
powerless to fix. *Henderson ex rel. NLRB v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 440 (4th
Cir. 2018); *Parents in Cmty. Action*, 172 F.3d at 1039 (applying the *Winter* test and describing
the Board's task in showing the "rare situation[] in which the delay inherent in completing the
adjudicatory process will frustrate the Board's ability to remedy" any resulting harm as a "high
hurdle"). As compared to the just and proper standard, this is the difference between the possible
and the highly probable. *See United Paperworkers Int'l Union*, 965 F.2d at 1409 n.3
(contrasting the "just and proper" standard with "the traditional, more stringent requirement of
irreparable harm"); *Nixon Detroit Diesel*, 859 F.2d at 30 n.3 (same); *see also Winter*, 555 U.S. at
22 (explaining that an irreparable injury is not demonstrated by proving the "possibility" of
harm).

An irreparable injury is one that cannot be remedied through "money damages or other
relief." 11A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2948.1
(3d ed.) (footnotes omitted). Had the district court been searching for one, it would have faced a
difficult inquiry: did Starbucks's purported unfair labor practices so thoroughly douse the
nascent unionization movement's fire that the Board would have been powerless to reignite it
going forward? *See Hooks ex rel. NLRB v. Nexstar Broad., Inc.*, 54 F.4th 1101, 1118–20 (9th
Cir. 2022) (holding that the district court abused its discretion in granting a § 10(j) injunction
where it presumed, rather than analyzed, irreparable harm to the Board's remedial power);
*Bluefield Hosp. Co.*, 902 F.3d at 442–43 (affirming, under the *Winter* test, the denial of a

No. 22-5730                    *McKinney v. Starbucks Corp.*                    Page 26

preliminary injunction where the Board "fail[ed] to demonstrate that the Board's ability to redress the alleged unfair labor practices will be impaired or frustrated"); *S. Bakeries*, 786 F.3d at 1125–26 (vacating a § 10(j) injunction where the Board did not make out irreparable injury to its remedial powers).

Consider whether that movement was actually chilled following the Memphis Seven's termination. The district court seems to have presumed that termination of union supporters necessarily produces an insurmountable chill on organizing. No such supposition would be allowed, however, under the irreparable injury inquiry. *See Bluefield Hosp. Co.*, 902 F.3d at 440 (highlighting "a fundamental tension between the Board's theories of inherent harm and the Supreme Court's recognition that 'a preliminary injunction is an extraordinary remedy never awarded as of right'" (quoting *Winter*, 555 U.S. at 24) (emphasis omitted)). Nor was there any description of why the Board could not ultimately remedy the follow-on effects of the terminations, if those terminations did indeed produce a chill. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 391 (6th Cir. 2020) ("To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" (quoting *D.T.*, 942 F.3d at 327)). Much the same is true for the court's finding that the absence of six of the bargaining committee's members would impair the remaining employees' ability to unionize. Perhaps that translates into irreparable injury, perhaps not. Before granting extraordinary relief, though, we should at least be asking the question.

3. Were it wrapping up an analysis under the *Winter* test, the district court would have also considered the balance of the equities and the public interest. *D.T.*, 942 F.3d at 326. It might have entertained, for example, Starbucks's unclean hands defense. *See Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995). Or the broad public policy implications of the growing unionization movement at Starbucks, a topic that has received national attention, including in in the halls of Congress. Heather Haddon, *Starbucks's Howard Schultz Faces Tough Questions from Bernie Sanders About Union Talks*, Wall St. J. (updated March 29, 2023, 3:52 PM), https://perma.cc/MGD8-P9AR.

Refusing to entertain arguments about those important considerations "slight[s]" them. *Spartan Mining Co.*, 570 F.3d at 543. Yet under our interpretation of "just and proper," it is not

apparent which factors (other than future injury) fit within that phrase's scope. We once suggested that a district court might consider aspects other than just potential future injury, like the Board's delay in seeking a § 10(j) injunction. *Frankel*, 818 F.2d at 495. But how broad is the doorway *Frankel* opens? Seemingly not so broad as to allow consideration of all four equitable factors, a point emphasized here, where Starbucks's unclean hands defense fell by the wayside. Maj. Op. at 11–12; *see also Ozburn-Hessey Logistics*, 875 F.3d at 343. Ultimately, *Frankel*'s hint remains only that: a hint. Litigants and lower courts are left to guess at what items fall under the just and proper prong. *Cf. Edwards v. Vannoy*, 141 S. Ct. 1547, 1566 (2021) (Gorsuch, J., concurring) ("Sometimes this Court leaves a door ajar and holds out the possibility that someone, someday might walk through it—though no one ever has or, in truth, ever will."). Utilizing the *Winter* standard would clear up this fuzzy picture.

4. All things considered, our § 10(j) jurisprudence has dramatically lowered the bar for the Board in securing an injunction, "an extraordinary remedy never awarded as of right." *Benisek*, 138 S. Ct. at 1943 (quoting *Winter*, 555 U.S. at 24). That body of law has produced predictable consequences. As a bottom-line matter, our feeble test stacks the deck in the Board's favor, a point the Board well understands: it claims to have achieved "either a satisfactory settlement or substantial victory in litigation" in a whopping 93 percent of the § 10(j) cases it brought in fiscal year 2022. Performance and Accountability Report FY 2022, at 86. And the slow pace of Board proceedings means that this "temporary" relief binds private parties for months, if not years.

That is no small matter for those restrained by the injunction. That equitable remedy amounts to a "drastic" judicial intervention, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), an exercise of the "strong arm of equity," with significant coercive effects. *Detroit Newspaper Publishers Ass'n v. Detroit Typographical Union No. 18*, 471 F.2d 872, 876 (6th Cir. 1972) (quotation omitted). Considerable forces push against allowing these invasions. One is our responsibility to guard individual liberty zealously from government incursion. *See Roman Cath. Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 69–72 (2020) (Gorsuch, J., concurring). Another is our obligation to rigorously police the limits of our own power. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) ("Requiring a plaintiff to demonstrate

No. 22-5730                    *McKinney v. Starbucks Corp.*                    Page 28

a concrete and particularized injury caused by the defendant and redressable by the court ensures that federal courts decide only 'the rights of individuals,' and that federal courts exercise 'their proper function in a limited and separated government.'" (internal citations omitted)).   If injunctive relief truly is "extraordinary," *Winter*, 555 U.S. at 24, then we should be doubly cautious before infringing upon a private party's ability to operate at the government's request.

*        *        *        *        *

Our 40-year experiment with borrowed jurisprudence has not served us well.  In the right case, our en banc Court should reconsider our approach to § 10(j).  We would not be the first. Among other circuits, the Seventh Circuit previously departed from its prior practice to conform to text and Supreme Court precedent, bringing its approach to § 10(j) in line with *Winter*.  Judge Easterbrook recognized there the hard truth that while "[c]ourts are reluctant to overrule their decisions," we "[n]onetheless . . . have an obligation to give statutes their proper meaning rather than to perpetuate the effects of our own mistakes." *Pioneer Press*, 881 F.2d at 491.  We would be wise to do the same.